## STANOLIND OIL & GAS CO. v. SELLERS et al.

### No. 3789.

United States Court of Appeals
Tenth Circuit.

May 16, 1949.

Rehearing Denied July 22, 1949.

W. W. Heard and Ray S. Fellows, Tulsa, Okl. (Donald Campbell, Tulsa, Okl., was with them on the brief), for appellant.

Houston Bus Hill and Duke Duvall, Oklahoma City, Okl. (Richard H. Godfrey, Oklahoma City, Okl., was with them on the brief), for appellees.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

C. H. Sellers and Clara H. Sellers, his wife, were the owners of the Southwest Quarter of Section 14, Township 14 North, Range 4 West, in Oklahoma County, Oklahoma. They had executed an oil and gas lease on this land. Owners of various royalty interests likewise had executed oil and gas leases covering their royalty interests. All of these oil and gas leases were ultimately assigned to the Stanolind Oil and Gas Company and it, as such owner, carried on all operations with respect to the leased premises out of which this controversy arose. Since the questions presented are common to all the leases, reference will be made only to the Sellers lease and the factual situation will be treated as though there were but one lease.

C. H. and Clara H. Sellers, his wife, instituted this action against the Stanolind Oil and Gas Company and other defendants. The interest of all defendants, other than the Stanolind Oil and Gas Company, as well as other parties who were subsequently interpleaded, are identical with that of C. H. and Clara H. Sellers, and all appear as appellees in this appeal.

Plaintiffs' complaint set out three causes of action. In the first cause of action, they sought the cancellation of the oil and gas lease, excepting from such action, however, the Southwest Quarter of the tract on which there was a producing oil and gas well at the time. In the second cause of action, they sought to recover damages caused by the alleged negligence on the part of Stanolind in failing to protect the tract from drainage from offsetting wells in the total sum of $30,000, and in the third cause of action they sought a judgment for $270,000 for the loss of the alleged oil still in place when the lease was released of record, resulting from plaintiffs' inability thereafter to obtain development of the premises because of Stanolind's alleged negligence in failing to either drill timely offset wells or promptly release their lease of record. The action was removed by Stanolind to the United States District Court for the Western District of Oklahoma on the grounds of diversity of citizenship and the presence of the required jurisdictional amount.

Since the oil and gas lease was released of record prior to the trial of the cause, the first cause of action was abandoned. The case was tried to the court and it found against Stanolind and in favor of the plaintiffs in all respects. The trial court found that Stanolind was negligent in failing to expeditiously drill Sellers Well Number 1, which was an offset well, and in failing to drill the three remaining locations on the Sellers tract, and that loss from drainage prior to January 17, 1947, when the lease was released, had occurred in the total sum of $16,022.13, and that Stanolind was liable for future damages after the lease was released in the total sum of $204,079.39 because of the failure and inability on the part of the plaintiffs to obtain development of the 120-acre tract thereafter on account of the negligent acts and conduct of Stanolind. Judgment was accordingly entered against Stanolind for such sums and this appeal followed.

The judgment of the court is based upon the general proposition that Stanolind had not acted as a prudent operator should have acted in developing this property and protecting it against damages, and that the damage for the sums found flowed from such negligent acts. Two questions present themselves for determination. They are, first, is the court's finding that Stanolind acted in bad faith and failed to discharge that high degree of responsibility required of a prudent operator to protect the premises from drainage from offsetting wells with resulting damage sustained by

the record? And if this question is answered in the affirmative, did such negligence subject Stanolind to liability for the value of the oil which the court found was still under the 120-acre tract at the time the oil and gas lease thereto was released?

The duty of a lessee to protect a lease from drainage from offsetting wells is well established. The test is generally referred to as the "prudent operator test." The cases which have had this question before them are myriad and they are all in general accord. The rule has been recently stated by us in the case of Gerson v. Anderson-Prichard Production Corporation, 10 Cir., 149 F.2d 444, 446, as follows: "A lease of this kind contains an implied covenant that the lessee will exercise reasonable diligence in the development of the leasehold and in the protection of it from undue drainage through wells on adjacent lands. And reasonable diligence in the development and protection of the premises means the doing of that which an experienced operator of ordinary prudence would do in the premises, having due regard for the interests of both lessor and lessee. But in the absence of a controlling stipulation, neither the lessor nor the lessee is the sole arbiter of the extent to which or the diligence with which the operations shall proceed. The standard by which both are bound is what an experienced operator of ordinary prudence should do in the circumstances, bearing in mind that the purpose of the contract is the mutual benefit of the lessor and the lessee."

As a corollary to this principle, it was stated in the Gerson case, that, "But the lessee does not bear an implied obligation to drill an offset well to prevent drainage unless, taking into consideration all existing facts and circumstances, it would probably produce oil in sufficient quantity to repay the whole sum required to be expended, including the cost of drilling, equipping, and operating the well, and also pay a reasonable profit on the entire outlay. No obligation rests upon the lessee to carry the operations beyond the point where they are profitable to him, even if some benefit to the lessor would result from them."

And further, we stated that, "The burden rested on plaintiffs to prove the breach of the implied covenant to protect the leasehold from undue drainage. It was incumbent upon them to prove that had an offset well been drilled on the Roosevelt Place Addition, it probably would have produced or would produce sufficient oil to repay the expense of drilling, equipping, and operating the well, and also pay a reasonable return on the outlay. * * * In other words, the ultimate fact necessary for them to establish was that it probably would have paid to drill an offset well."

This is also the established rule in the Oklahoma courts.[1]

We have quoted at length from our opinion in the Gerson case because it clearly sets forth the principle by which the questions presented must be decided, and because, in the interest of brevity, we shall not cite the numerous other cases which have dealt with this problem.

Our first inquiry then is to search the record to see if there is substantial evidence supporting the court's finding that the acts and conduct of Stanolind did not meet the requirements of the rule. If so, the judgment in that respect must be affirmed even though we as the trier of the facts might have reached a different conclusion.

A somewhat extensive, detailed recital of the facts is necessary to present a clear picture. The West Edmond Oil Field is a large field comprising some 28,000 acres and containing approximately 700 producing wells. The Sellers lease in question is an east edge lease. No oil has ever been discovered in this field east of a line drawn north and south along the east edge of this lease. In fact, no producing oil and gas well has been found east of an extended line drawn north and south through the center of the Sellers tract. The discovery well in the Edmond Field was brought in in April, 1943. Development was rapid between that time and January 1, 1946, at

1 Broswood Oil & Gas Co. v. Mary Oil & Gas Co., 164 Okl. 200, 23 P.2d 387; Indian Territory Illuminating Oil Co. v. Haynes Drilling Co., 180 Okl. 419, 69 P.2d 624; Ramsey Petroleum Corp. v. Davis, 184 Okl. 155, 85 P.2d 427.

which time the field was practically completed.

The Sellers tract was an isolated tract not offset by any production on January 18, 1945, when Stanolind acquired the lease. Two dry holes had been drilled at that time, High Tower Young Well Number 1 and Apex Well Number 1. The High Tower Well was five locations north and two locations west of the Sellers lease,[2] and the Apex Well was three locations directly south of the southwest forty acres of the Sellers tract. This tended to indicate that the limit of production from the Hunton Limestone formation was close to the Sellers tract. However, shortly before the lease was acquired by Stanolind, Phillips Petroleum Company had completed its Phillips-Jorgenson Well Number 1, one mile north and slightly more than ¾ mile west from the northwest corner of the Sellers tract, as a good oil well in the Lower Hunton formation. It was one of the first wells to develop this Lower Hunton formation. In reliance on this well, Stanolind purchased the Sellers lease, paying $16,000 cash and subject to a 1/16 of 7/8 overriding royalty interest. Thereafter development moved rapidly southeastward from Phillips-Jorgenson Number 1. On October 19, 1945, Sinclair Prairie Oil Company completed its Sinclair-Boling Number 1 well as a commercial oil well. This was a western offset to the Northwest forty acres of the Sellers tract. This well encountered a total productive interval of 151 feet in the Hunton Limestone formation, of which 129 feet was in the Upper and 22 feet in the Lower Hunton formation. A test of the well showed that the top 95 feet of the 129 feet of Upper Hunton formation was gas saturated and would produce no recoverable oil. This left only 56 feet of oil producing formation, the lower 34 feet of the Upper Hunton and 22 feet in the Lower Hunton. The problem facing Stanolind then was to determine whether, in view of this, it was warranted in going a quarter of a mile farther east and expending $75,000 more to drill an offset to this well. Some of the problems confronting Stanolind were

that the Sellers land was located higher structurally than the Boling land and it was feared that the Upper Hunton formation would be 100 per cent gas saturated. Subsequently this proved to be correct. The Lower Hunton formation upon which Stanolind was required to rely for production was thinning out from the west to the east toward the Sellers land and Stanolind feared that the 22 feet of the Lower Hunton formation in Boling Number 1 would be no greater, and might be less under the Sellers tract. These were reasonable assumptions and were actual problems confronting Stanolind at that time. Also prior to the completion of Boling Number 1 on October 19, Magnolia Petroleum Company had on October 10 spudded in and was in the process of drilling its Kibby Number 1 Well. This well was located one location north of the northwest forty acres of the Sellers tract. Sinclair Prairie Oil Company also was preparing, and on December 1, 1945, spudded in its Boling Well Number 2. This was an offset to the southwest forty acres of the Sellers tract. On December 2, 1945, Kibby Number 1, immediately to the north of the northwest forty acres of the Sellers tract, came in as a non-commercial gas well. No production from the Lower Hunton formation was obtained in this well. On January 2, 1946, Sinclair Prairie Oil Company completed its Boling Well Number 2. This well encountered 84 feet of productive interval in the Upper Hunton sand, all of which was gas saturated, and would contribute nothing to the recovery of oil from the well, except the lower four feet thereof. The well did show 64 feet of sand in the Lower Hunton, all of which was oil producing. Thus, it was established that the oil producing sand in this well was nearly three times as great as in Boling Number 1 where only 22 feet of such sand was encountered. Relying upon the information obtained from the drilling of this well, Stanolind, within 65 days, began drilling an offset to this well, its Sellers Number 1. This well was spudded in March 6, 1946, and was completed on April 22, 1946. Sellers Number 1 encountered a productive

[2] By order of July 1, 1943, the Oklahoma Corporation Commission established 40-acre well spacing or drilling units for the development of the Field.

interval of 72 feet in the Upper Hunton formation and only 30 feet in the Lower Hunton formation, as compared with 64 feet in the same sand in Boling Number 2. A test of the well showed that the entire 72 feet of the Upper Hunton was gas saturated and would contribute nothing to the recovery of oil and that the oil producing strata was limited solely to the 30 feet of the Lower Hunton formation. The picture then as presented by these three wells showed that the oil producing sand in Boling Number 2 was nearly three times as thick as in Boling Number 1 to the North, but that this sand had shrunk in Sellers Number 1, one location to the east to less than one-third the thickness thereof. What then was there in this picture at that time as revealed by these three wells which would lead a prudent operator to expect that notwithstanding this decrease in the depth of the oil producing sand by more than 66% that the depth of the sand would not further decrease yet one location farther east or that the oil producing sand would not also decrease in Sellers offset well to Boling Number 1? True, no one can tell with certainty what lies three or four thousand feet beneath the earth's surface, but these wells and the locations and tests themselves speak a language that is well understood in the oil fraternity and is not veiled in too much mystery even for comprehension by the average layman.

Stanolind produced a number of qualified experts whose qualifications are not challenged, who were on the ground during all this time and who had knowledge of the actual drilling operations, the locations of these wells and the tests made thereof. Without exception, they testified that it was their considered opinion that Stanolind was not warranted at that stage in expending $75,000 more in drilling an offset to Boling Number 1, or the remaining two locations still farther to the east on the Sellers lease. Stanolind estimated the maximum ultimate recovery of oil from its Sellers Number 1 at 60,000 barrels and that a maximum recovery of 90,000 barrels under existing economic conditions was required to pay the costs of drilling, equipping and operating the well. There is

also uncontradicted testimony that Sellers Number 1 well was a weak and erratic well in its performance, that it fluctuated greatly in production. Thus on one day it produced 54 barrels of oil, on another day 150 barrels, and yet on another day 78 barrels, and so on. It is also without dispute that Sellers Number 1 was never able to produce its allowable production assigned to it by the Oklahoma Corporation Commission. Stanolind also offered testimony that under these circumstances it was necessary to observe the well's behavior for a number of months to see if it would level off and steadily produce a reasonable amount of oil and that this could not be done in a period of two months. Under these circumstances, Stanolind decided to wait a reasonable time to determine whether to undertake future drilling operations or surrender the lease. This conclusion was fortified in part by the fact that on May 6, 1946, Fox and Fox commenced the drilling of their Surbeck Well Number 1, a direct south offset to Sellers Number 1. This well was completed on June 20, 1946, as a non-commercial oil well. This well encountered a total productive interval of 51 feet—21 feet in the Upper Hunton and 30 feet in the Lower Hunton.

Thus, the factual situation existing at the time of the completion of Fox and Fox-Surbeck Number 1, June 20, 1946, with respect to the line of wells lying north and south of the W $\frac{1}{2}$ of the Sellers tract was as follows: Magnolia-Kibby No. 1, a non-commercial gas well; Stanolind-Seller Number 1, a non-commercial oil well; Fox and Fox-Surbeck Number 1, a non-commercial oil well; and Apex-McKee Number 1, a dry hole in the Hunton Limestone formation. It is obvious that this line of wells was more indicative of the productive possibilities of the W $\frac{1}{2}$ of the Sellers tract than the line of wells to the west since the latter are lower on the structure and are farther removed from the edge of the field.

In the light of these facts, Stanolind was of the opinion that it was necessary to observe the action of its Sellers Number 1 for a reasonable time to see whether it would level off and steadily produce a reasonable quantity of oil before determin-

ing whether further drilling operations should be undertaken or the lease be surrendered. The justification for this is supported in part by Wheeler's own testimony when he testified with respect to bottom hole pressure that, "You needed a long range of bottom hole pressures compared to other wells. Individual tests are often incorrect, * * *." Testimony was offered that after observing the actions of this well for four months and nineteen days and taking into consideration the information obtained from these other wells, the conclusion was reached that further drilling operations would be unprofitable and that it was then concluded that the lease to the undeveloped portion of the tract should be surrendered.

Not one of the twenty plaintiff owners of interest in the Sellers land, except Sellers, ever made a demand or even an inquiry, written or verbal, relative to the operation and development of this tract. Sellers made several demands with respect to operations under the leases. Approximately four months after the completion of the Sellers Well Number 1, he wrote Stanolind a letter demanding that Sellers Well Number 2 be drilled and back royalty be paid to October 1, 1945. In response to this letter, Stanolind on August 29, 1945, advised Sellers that it was investigating the advisability of drilling a second well; that as soon as the investigation was completed a decision would be made and Sellers advised accordingly. Twenty-four days thereafter and four months and nineteen days after the completion of Sellers Number 1, Stanolind decided that the performance of Sellers Number 1, taken in connection with all the other information it had, did not warrant expenditure of $75,000 additional money. Accordingly, on September 10, 1946, it advised the then owners of the overriding royalty interest of its intention to release the 120-acre portion of the tract unless such owners desired reassignment of the leases to them. On September 14, 1946, Jenkins replied requesting reassignment of that portion of the lease. No reply having been received from the two remaining overriding royalty owners, Stanolind on October 3, 1946, assigned its leasehold interest to Jenkins to the undeveloped 120-acre portion of the tract. Thereafter on January 17, 1947, Jenkins and his wife released their interest in the lease to the 120-acre portion of that tract. On January 23 and February 28, 1947, the remaining overriding royalty owners released their interest therein, thus completely releasing the lease of record.

An extended recitation of these facts in considerable detail is necessary to present a true picture of the situation. Considered in their setting and without taking into consideration the testimony of appellees, these facts seem to be overwhelming and to support but one conclusion, namely, that Stanolind acted in good faith and in the only way that a prudent operator would have acted under all the circumstances as outlined above.

Against this overwhelming array of physical facts and expert testimony based thereon, plaintiffs offered the testimony of only one witness, Robert R. Wheeler. Wheeler graduated from Johns Hopkins University with an A. B. degree in Geology in 1938 and from Harvard with a Doctor's degree in Geology in 1942. He testified categorically that Boling Number 1, Boling Number 2 and Sellers Number 1 were commercial wells and that prudent operation required an immediate offset to Boling Number 1 as well as to Boling Number 2. He testified as to the amount of loss from drainage because of the failure to promptly drill an offset to Boling Number 1. He also testified that a prudent operator would have drilled wells on the remaining 120 acres of the tract. He further testified that the reserve of recoverable oil under the 120 acres of the undeveloped portion of the Sellers lease was approximately 520,550 barrels of oil on January 17, 1947, the date of the release of the lease.

■ There was a clear conflict in the evidence as given by Wheeler and that given by the expert witnesses for Stanolind. The court adopted the testimony of plaintiffs' sole expert witness and rejected that of the numerous experts offered by Stanolind. This does not constitute reversible error if the testimony of Wheeler is competent and is sufficient to

sustain the burden resting upon plaintiffs in a case such as this to prove that an offset well probably would have paid out. See Gerson v. Anderson-Prichard Production Corp., supra.

Wheeler had no personal knowledge of the Edmond Field during its actual development period. All his knowledge was obtained from a study he made after this litigation had begun. He made a study of the well logs around the property, read several papers and articles that had been written on the West Edmond Field during the latter part of 1945 which gave estimates of the ultimate productivity of the pool. His testimony as to the productivity of the field and the recoverable oil therefrom was of little value because, based upon a reading of these articles written by others, in effect, he was merely repeating by hearsay what the authors of these articles had told him in their articles. He was not even in possession of all of the physical facts concerning the wells adjacent to the Sellers lease and including Sellers Number 1 when he testified. While he had access to the logs of these wells, he had no knowledge of the various tests which had been made of these wells. All he knew was the thickness of the Upper and Lower Hunton formation, but he did not know the degree of saturation, and whether with oil or gas, of these sands. These facts could only be learned from a number of tests which were actually made of these wells and of which he had no knowledge. These facts were of great materiality in determining not only the quality of these wells but also the possible conditions of these formations eastward toward the Sellers tract. So also he testified that he did not know the initial reservoir pressure in the Hunton Limestone formation in the West Edmond Field. His lack of specific knowledge is also shown in the following answer to a question. "You can continue to question me regarding these engineering facts, formulas and figures, and so on indefinitely, but it will be very difficult for me to answer some of them." Furthermore, a careful analysis of Wheeler's testimony impels the conclusion that he based his testimony and conclusions almost entirely upon unitization of the West Edmond Field which was effected after Stanolind surrendered the Sellers lease. Thus, he testified, "I am not going to attempt to go into complicated engineering formulas for computing recoverable oil by other methods than which I have attempted. Q. For the reason that you have accepted for your purposes this participation formula in connection with the allocation of oil under the proposed unit plan? A. If it is good enough for Stanolind it is good enough for me." And again, in response to the following question, he said, "Q. In other words, you think the formula is a good method for estimating the recoverable oil under a lease? A. Yes, sir."

Almost from the inception of the West Edmond Field a movement was on to unitize the entire field and operate it as one unit. Stanolind owned other leases in the field and was an active proponent of the unitization movement. There was also strong opposition to this movement. Fifteen per cent of the owners in the pool could block unitization. The application for unitization of the field was not filed with the Oklahoma Corporation Commission until January 29, 1947, more than 90 days after Stanolind had relinquished the lease to the 120 acres and was not granted until July 29, 1947, more than eight months thereafter. Under the unitization agreement, a percentage participation factor in the entire block from the pool was assigned to each lease. The 40-acre tract on which Sellers Number 1 Well was located was included in the pool and had assigned to it its percentage participating factor in the pool production.

The evidence is that an estimated 140,000,000 barrels of oil was recoverable from the field by primary methods of operation and that an estimated 220,000,000 barrels was recoverable under unitization with gas injection. In reaching his conclusions as to the amount of oil originally under the Sellers tract as a whole, Wheeler used the percentage participation factor allocated to the producing 40-acre Sellers tract and by other mathematical computations established percentage participating factors for the remaining 120 acres and thus arrived at a participating factor of .467% for the entire tract. Applying this factor to the esti-

mated total recoverable oil of 220,000,000 barrels, he arrived at 1,027,400 barrels of oil as the number of barrels of oil originally existing under the Sellers land. By like percentage factors applied to the estimated 220,000,000 barrels of oil he reached his conclusion that on the date when the lease was released by the overriding royalty owners there were 520,550 barrels of recoverable oil under the 120 acres released. He also applied these participating percentage factors to the estimated 140,000,000 barrels of oil recoverable by primary operation in reaching his conclusion as to the amount of oil recoverable from the Sellers lease by such operations. So also his conclusions that Sellers Number 1 Well was a commercial well was influenced by reliance upon the estimated assigned production thereto in the unitization pool.

The fallacy of this testimony is apparent upon its face. The percentage of an estimated pool recovery under a unitized operation assigned to a particular lease represents at best only an estimated contribution from that tract under a single unitized operation. Without more, it cannot be taken as evidence of the estimated recovery therefrom under an independent, individual operation of the lease. So also the fact that a well under unitized operation reasonably may be expected to return the investment and a profit thereon is no evidence that it would do likewise under an independent operation.

But of even more importance is the fact that none of these factors upon which Wheeler predicated his entire testimony were in existence or known to Stanolind at the time it was faced with the necessity of making its decision. It therefore could not have considered them in reaching its conclusions and may not be convicted of bad faith or imprudent operation because of factors which became known only after the time when it was faced with the necessity of making a decision. Wheeler's testimony, based on subsequent events, was not competent to sustain the burden resting upon plaintiffs to establish bad faith and imprudent operation on Stanolind's part. The test is not what a reasonably prudent operator would have done in the light of these subsequent facts, but

what he would have done under the known existing circumstances at the particular period of the alleged breach. As stated in the cases, his conduct is to be judged by foresight and not hindsight. Myers et al. v. Shell Petroleum Corporation, 153 Kan. 287, 110 P.2d 810; Gerson v. Anderson-Prichard Production Corporation, 10 Cir., 149 F.2d 444.

Since the trial court based its findings of fact and conclusions of law holding Stanolind liable for bad faith in not drilling timely offsets to prevent drainage solely on this incompetent evidence, it follows that its findings and conclusions in this respect are without support of competent evidence and must be set aside.

It is argued that had Stanolind either promptly drilled an offset to Boling Number 1, or in any event promptly released the lease after it drilled Sellers Number 1, the owners of the 120-acre tract could have obtained the development thereof by another driller. It is urged that Earl Westcott, a driller called as a witness by plaintiffs, testified that he would have drilled the 120-acre tract in that event. A careful analysis of his testimony does not support this contention. He did testify that he "probably" would have been interested in drilling but that he had never made up his mind to that effect and that before he would have drilled it would have been necessary to satisfy himself as to the thickness of the pay sand under the Sellers well and also that it was making its allowable, none of which factors were known to him. In response to a question whether he did testify that he would have drilled the well, he answered, "I couldn't say yes, or I couldn't say no."

But even if we assume that Wheeler based his testimony and conclusions that a prudent operator would have drilled the Sellers lease upon factors other than the unitization of the field and the percentage allocation factor adopted thereunder, the judgment still must be reversed.

As pointed out, he had no contact with or knowledge of the development of the West Edmond Field while it was being developed. In fact, he graduated from college only one year before the discovery well was drilled. He had no knowledge

of the field until after this litigation began and then such facts as he learned, he learned in retrospect. What knowledge he gained, according to his own testimony, he obtained from a study of the logs of the wells around the property and from scientific articles written by various persons dealing with geological data pertaining to the field. His testimony as to the contents of these scientific articles was improperly received. It constituted hearsay. He merely repeated what the authors thereof told him in their articles. Appellants were right in their objection to this portion of his testimony.

So, also, as already pointed out, he was not even in possession of all of the other physical facts necessary to form a considered judgment as to the problems confronting a prudent operator at the time a decision was necessary. As already pointed out, he had no knowledge of the numerous actual tests which were made of these various wells to determine the nature and quality of the sand formations found therein. He did not know the porosity or the extent of the oil or gas saturation thereof; neither did he know the action or results of the Sellers well as revealed by its operation over a number of months. He knew nothing of these things, all of which were vital in reaching a considered judgment with respect to the question of prudent operation. Thus, giving his testimony the most liberal construction possible, it is not sufficient to sustain the burden which rested upon appellees to show bad faith or imprudent operation on Stanolind's part.

The trial court's judgment on the third cause of action for $204,000 was predicated upon its conclusion that the wrongful conduct of Stanolind, while it retained the lease, in failing to properly develop the premises made is impossible for the owners to recover in the future the oil which the court found was under the premises at the time the lease was released of record.

It is axiomatic that if Stanolind was guilty of no bad faith or wrongful conduct, as we have found, in not drilling further wells, it had in any event the right to release the lease of record and could not subject itself to any liability by so doing.

The court therefore erred in finding and concluding as a matter of law that Stanolind's conduct was responsible for the loss to plaintiffs of the vast quantity of oil which the court found was under the 120-acre tract at the time the lease was released of record.

The judgment is reversed in toto and the cause is remanded with directions to enter judgment for appellant.

MURRAH, Circuit Judge (concurring).

While agreeing that the judgment of the trial court must be reversed on both causes of action, I cannot agree that Dr. Wheeler's testimony, upon which it is based, is wholly incompetent and without probative value. Particularly, I cannot agree that his testimony concerning imprudent development is based upon the so-called unitization formula. The witness specifically stated that the unitization formula was utilized only as a measure of damages, and the trial court pointedly observed that it would not consider it in determining whether, as a prudent operator, Stanolind should have drilled the protective offset wells; that the formula was relevant and would be considered only for the purpose of estimating the amount of recoverable oil under the lease as a measure of damages for the breach of the implied covenant to drill.

If I read the majority opinion aright, it assumes the premise that the trial court's judgment is based upon the application of the unitization formula in the determination of the critical question of prudent development. My concurrence in the reversal is based squarely upon the premise that when Dr. Wheeler's testimony concerning whether Stanolind should have drilled the offset wells is considered in the light of the physical facts and judged by the Oklahoma prudent operator rule, well stated in the opinion, it is insufficient to support a finding of bad faith as a basis for a legal conclusion of imprudent development. This being so, it becomes unnecessary to consider whether the unitization formula could form the proper basis for estimating the amount of recoverable oil underlying the lease as a measure of damages for wrongful failure to develop.