## RAMSEY PETROLEUM CORPORATION v. DAVIS et al.

No. 26800.    Dec. 20, 1938.

156

pany drilled two wells on the north ten acres. Well No. 1 was located 256 feet south and 202 feet west of the northeast corner, and was completed September 10, 1919, with an initial production of 175 barrels of oil. Soon after the first well was completed, the plaintiffs filed a suit against the Keeche Oil & Gas Company to cancel the lease, and the judgment in that case was appealed to this court and was determined against the plaintiffs on May 1, 1923 (Davis v. Keeche Oil & Gas Co., 89 Okla. 226, 214 P. 711). While that litigation was pending, and during the year 1920, an offset well was drilled 154 feet east of the south ten acres with initial production of 30 barrels, and another offset well was drilled 193 feet south of the south ten acres with initial production of 35 barrels. In August, 1919, a diagonal offset was drilled southeast of the south ten acres with initial production of 150 barrels. In 1920, a diagonal offset to the southwest of the south ten acres was drilled and came in dry and was abandoned. In 1922, an offset well was drilled 214 feet west of the south ten acres with initial production of five barrels. After the termination of the litigation, Well No. 2 was drilled 106 feet north and 335 feet west of the southeast corner of the north 10 acres, and was completed April 6, 1935, and the initial production was 35 barrels. No well has been drilled on the south ten acres of the lease in controversy, and the record shows that the wells offsetting said ten acres are, or were at the time of the trial in this case, still producing oil, but the record is not clear as to how much each of those wells is producing, since the oil is being run into receiving tanks with the oil from other wells.

The defendant, Ramsey Petroleum Corporation, acquired the lease on May 16, 1931. On February 4, 1933, the plaintiffs made a written demand upon the defendant to either drill a well on the south ten acres or pay royalty, and stated in the letter that if it did neither, suit would be filed to cancel the lease. The defendant failed to comply with the demand and this action was filed on December 27, 1933, and the plaintiffs prayed for cancellation of the lease on the south ten acres, or in lieu thereof, for a money judgment not to exceed $2,500. On the trial of the case, judgment was rendered for the plaintiffs canceling the oil and gas lease on the south ten acres. From that judgment this appeal was taken.

■ The first three propositions of defendant pertain to the sufficiency of the evidence. The findings of the trial court

Jarman & Brown and W. L. Harris, for plaintiff in error.

Melton & Melton, for defendants in error.

BAYLESS, V. C. J. This is an action for the cancellation of the undeveloped portion of an oil and gas lease. The record shows that the lease was executed on June 5, 1916, covering the W.½ of the N.E.¼ of the N.E. ¼, section 1, township 5 north, range 10 west, in Caddo county, and was for a term of two years and as long thereafter as oil or gas is produced. The lease also provided that unless a well was commenced by June 5, 1918, the lease should terminate unless rentals were paid. The plaintiffs were the lessors and the Keeche Oil & Gas Company was the lessee. The Keeche Oil & Gas Com-

were that defendant had knowledge of the extent of development on this lease when it bought the lease; that it knew of the development of adjoining leases and knew that the wells thereon drained oil from under the south ten acres. The trial judge specifically refers to the failure to reasonably develop under the covenants of the lease. We will first determine if the evidence supports the judgment on the theory that there has been a breach of an implied covenant.

(a) According to Merrill on Covenants Implied in Oil and Gas Leases, p. 20, the implied covenants may be classified into four groups: (1) Implied covenant to drill a test well, (2) implied covenant to drill additional wells, (3) implied covenant for the diligent and proper operation of the lease if oil or gas is found in paying quantities, and (4) implied covenant to protect the lease premises from drainage by wells on adjoining land. In the present controversy we are only concerned with the covenant to drill additional wells, and with the covenant to protect the lease premises against drainage. Moreover, our discussion will be limited to the operation of those covenants after the expiration of the primary term with production, inasmuch as the exploratory period in the case at bar has long since expired.

The courts are now agreed that the duty imposed by the implied covenants under discussion is to use reasonable diligence and care to develop and protect the entire lease premises for the common benefit of both parties, having due regard for the interests of each. Merrill, Covenants Implied in Oil and Gas Leases, p. 18. The leading case is Brewster v. Lanyon Zinc Co. (1905) 140 Fed. 801. When it has been determined that the lessee has not complied with this duty, he may be compelled to surrender that portion of the lease premises which he has not properly developed or protected, even in the absence of a forfeiture clause, on the theory that the covenant is a condition. Fox Petr. Co. v. Booker (1926) 123 Okla. 276, 253 P. 33. It was said in Pelham Petroleum Co. v. North (1920) 78 Okla. 39, 188 P. 1069:

"It is now well settled that a court of equity will declare a forfeiture of an oil and gas lease because of the breach of an implied covenant to diligently operate and develop the property when such forfeiture will effectuate justice, but the granting of such relief depends upon the facts and circumstances surrounding the particular case."

To the same effect are the cases of Papoose Oil Co. v. Rainey (1923) 89 Okla. 110, 213 P. 882; Carder v. Blackwell Oil & Gas Co. (1921) 83 Okla. 243, 201 P. 252, and Blackwell Oil & Gas Co. v. Whitesides (1918) 71 Okla. 41, 174 P. 573. But the difficulty arises in determining when there has been a breach of these implied covenants. The courts have found it impossible to prescribe any fixed rule, and therefore resort to standards for measuring "reasonable diligence". Two tests have been developed: (1) the test of what an ordinary prudent operator would do; and (2) the standard of "good faith." The former test simply requires the lessee to do whatever in the circumstances would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, but neither the lessor nor the lessee is the arbiter of the extent to which, or the diligence with which, the operators shall proceed. Brewster v. Lanyon Zinc Co., supra; I. T. I. O. v. Haynes Drilling Co. (1937) 180 Okla. 419, 69 P.2d 624; Pelham Petroleum Co. v. North, supra; Donaldson v. Josey Oil Co. (1924) 106 Okla. 11, 232 P. 821; Robinson v. Miracle (1930) 146 Okla. 31, 293 P. 211; Broswood Oil & Gas Co. v. Mary Oil & Gas Co. (1933) 164 Okla. 200, 23 P.2d 387. The good faith test, used in a few states, leaves the determination of the obligation to drill entirely to the lessee, providing he acts in good faith. Although in Mistletoe Oil & Gas Co. v. Revelle (1926) 117 Okla. 144, 245 P. 620, this court gave significance to the good faith of the lessee in refusing to cancel that part of the lease which the lessee had developed in good faith, while canceling the other part, yet unquestionably the prevailing test in this state is the ordinary prudent operator standard. Pelham Petroleum Co. v. North, supra; Indiana Oil, etc., Co. v. McCrory (1914) 42 Okla. 136, 140 P. 610 (involving action for damages not material herein); Eastern Oil Co. v. Beatty (1918) 71 Okla. 275, 177 P. 104; Gypsy Oil Co. v. Cover (1920) 78 Okla. 158, 189 P. 540. The courts have made no distinction in the application of this test to covenants to drill additional wells and covenants to protect against drainage. Donaldson v. Josey Oil Co., supra; Fox Petroleum Co. v. Booker, supra; Pelham Petroleum Co. v. North, supra; Merrill, Covenants Implied in Oil and Gas Leases, p. 188. But in each instance, depending on the particular circumstances, many factors must be considered, including: (1) Location of lease premises—whether in wildcat territory, or producing field; (2) probable quantity of oil and gas capable of being produced from

the lease premises as indicated by the prior development; (3) market conditions and transportation facilities; (4) the extent and result of operations on adjacent lands; (5) the extent of the area which is normally drained by a well in that field; (6) the character and extent of the subsurface structure and sand in that area; (7) the expense necessary to secure production and operate producing wells for protection against drainage; (8) whether the well to be offset is producing oil or gas in paying quantities; (9) usage of the business, and cost of drilling, producing, and marketing. Brewster v. Lanyon Zinc Co., supra; Merrill, Covenants Implied in Oil & Gas Leases, 193 et seq. The burden of proving the breach of these implied covenants is upon the plaintiff. Thornton, Oil and Gas, sec. 527; Brewster v. Lanyon Zinc Co., supra. In view of the nature of the factors to be considered, it may be said, generally speaking, that the lessor, in order to prove a breach of the covenant to drill additional wells, must show that the additional well would probably produce sufficient to repay the expense of drilling, equipping, and operating such well and also produce a reasonable profit on the entire outlay. Brewster v. Lanyon Zinc Co., supra; Pelham Petroleum Co. v. North, supra; Indiana Oil etc., Co. v. McCrory, supra. It is said in Robinson v. Miracle, supra, that "the lessee is not required to drill additional wells where the probability of his making a profit on the further operations is small." But it must be noted that in Fox Petr. Co. v. Booker, supra, the court said:

"The statement that the implied covenant for further operations is limited to cases where there is likelihood of profit to the lessee must be taken in a restricted sense and is not of universal application. It will depend upon the facts and circumstances of the particular case."

When thus analyzed we agree with defendant that the plaintiffs have failed to establish a breach of this particular covenant. In the evidence in chief they made no attempt to show the cost of an additional well or that it would be profitable to the lessee. Moreover, considering all the testimony in the case, it appears that the cost of drilling and equipping a well in the vicinity of this lease is from $16,000 to $30,000. The record shows that from January 1, 1934, the two wells on the north 10 acres produced 4,383.17 barrels, or approximately eight barrels per day, and it appears that the south well was producing about three barrels per day. The price of oil was approximately a dollar a barrel. The testimony of the geologists further showed that the sand dipped materially to the southwest and that there was little likelihood of obtaining sufficient production from an additional well on the south ten acres to afford a reasonable profit as contemplated. It must be remembered that the problem of the best location for a well is always a factor. In this case the plaintiffs interfered in the development of this lease for a period of about five years by the prosecution of the previous litigation. At the time of the beginning of that litigation, the knowledge of the subsurface conditions possessed by defendant's predecessor was largely theoretical, and now we can only speculate as to where it would have located a second well if it had not been interfered with. At any rate, when that litigation had terminated and the lessee was ready to locate and drill a second well, development around the lease had clearly defined the limits and trends of the producing sand, and the decline in production of the wells drilled on this and adjoining leases gave concrete evidence of subsurface conditions. Possession of this information made the problem of the location of this well one to be governed by scientific knowledge rather than by scientific theory. It is true that the defendant's geologist witness testified that had he been the lessor, he would have required the drilling of a well on the south ten acres long prior to the time the second well was commenced. But this does not in any wise convict lessees of failure to develop, for, as stated above, the plaintiff lessor was preventing any development during all of this period. However, this is not all he said. He said that, considering all factors, the location of the second well (at the time it was located) was definitely the best location on the 20 acres. He was of the opinion that the two wells were sufficient development.

Considering all of the evidence, we do not believe that the plaintiffs have shown the defendant to be lacking in reasonable diligence in the development of the 20-acre lease.

(b) Regarding the duty to drill offset wells to protect against drainage, although generally the same factors should be taken into consideration, yet an additional requirement is that the lessor prove that the adjoining wells are draining to a substantial amount. Eastern Oil Co. v. Beatty, supra; see, also, 41 Yale Law J., p. 266, for a note on "Limitations on Right to Pro-

tection Against Drainage under Oil & Gas Leases," including the test by which to determine a breach.

It is conceded that wells which draw oil from the same pool draw oil from a distance around the bottom of each well. In other words, a well will reach out for the oil which it sends to the surface, and naturally a well is not a respecter of title boundaries. The expert witnesses testified that such was the effect of the wells mentioned herein, and their opinion is that such effect can be described as being in the nature of a circle having a radius of some 600 feet. Therefore, each of the wells drilled on the adjoining leases, as offset wells, had the effect of reaching under the boundary of plaintiffs' lease and drained oil from under his land. Because of the locations of these wells their circles of drainage overlapped. The evidence showed with a considerable degree of certainty the extent of their drainage.

To us this is not sufficient. There are two material aspects of this situation which the plaintiffs have failed to take into consideration in attempting to establish their cause of action on this ground. First: Since each well has the effect of draining for a given distance, the well which plaintiffs say ought to have been drilled on the south ten acres would not have prevented the drainage by surrounding wells, but would only have reduced the amount. There is no showing respecting the extent to which this would have lessened, and this would be material in determining whether conceded drainage thus lessened would be substantial. Second. If plaintiffs infer from this proof and their argument that drainage must be prevented or minimized in all instances and at all hazards, they overlook the obvious fact that the prudent operator rule must apply here also. A lessee is not required to drill a well to prevent drainage except upon the same terms and conditions he would drill a well to comply with any other covenant of the lease. No effort was made to show facts that would bring the desired well on the south ten acres within the prudent operator rule, as above outlined.

It may be that the plaintiffs will say that a well drilled on the south ten acres would have drained oil from the adjoining leases, and would thereby have recouped some of the lost oil. Facts may or may not establish such a condition. Actually, the evidence is that, considering all factors known at the time of the location of the second well, the location chosen was the best available because it would produce more oil for the lessor and lessee than a well at any other location, and this irrespective of unchecked drainage by other wells and its power to drain from other leases. This is a complete answer to plaintiffs' contention in this respect.

Since some drainage was unavoidable, and since the production from the second well was the best that could have been obtained, we must hold that the plaintiffs have not made out a case of drainage sufficient to justify canceling the lease.

Up to this point we have not mentioned an argument made by the plaintiffs with respect to their right of cancellation based upon the alleged abandonment, by the defendant, of the undeveloped portion of the lease.

In answering the defendant's first proposition, the plaintiffs begin with the citation of authorities which treat of cancellation for breaches of the covenants and for abandonment. With this beginning, the plaintiffs continually advert in their argument to abandonment as the basis for cancellation. But for fear that we should treat abandonment and breach of the covenant as identical, the plaintiffs paused to call our attention to the fact that they are separate and distinct rules of law and should not be confused.

We recognize the difference between the two. It is the recognition of this difference that causes us to hold that abandonment was not an issue in this case in the trial court, and to hold, further, that it is not an issue which can be raised on appeal for the first time.

It must be conceded that some allegations in a pleading designed to charge a breach of a covenant to develop, and the evidence which might be adduced thereunder, might well be used in pleading and proving a cause of action based upon abandonment. It is these parallels which lead some writers to speak of the difference between the two as being shadowy.

However, in this case we do not find an allegation in the pleadings of the plaintiffs, when considered with all other allegations, that can reasonably be construed to intend to charge abandonment as the ground upon which the action was based. The premises laid by the plaintiffs and all of the subsequent allegations demonstrate clearly that the plaintiffs had in mind canceling the lease because of inadequate development.

Another indication of the frame of mind

of the plaintiffs is the notice given to the defendant prior to bringing the suit. This notice, in effect, gave the defendant two options: (1) It could drill; or (2) it could pay royalty. Either of these options is wholly inconsistent with abandonment. If the lessees had abandoned the lease, their obligation to develop or their privilege to pay any money and thereby hold the lease was at an end. We do not intend by this observation to charge the plaintiffs with having waived their rights under the theory of abandonment, but rather to say that the notice indicates an intention to force action, or in the event of the defendant's failing to comply with the demands of the notice, to cancel for the failure to adequately develop—a breach of the covenants of the lease. Abandonment was not in plaintiffs' minds, and they intended neither to waive nor enforce their rights based thereon.

Since abandonment was not an issue in the trial of the cause, it is not proper for the plaintiffs to raise it here for the first time.

Reversed.

WELCH, CORN, GIBSON, DAVISON, and DANNER, JJ., concur. OSBORN, C. J., and RILEY and HURST, JJ., dissent.

HURST, J. (dissenting). I am of the opinion that the judgment should be affirmed on the theory of abandonment.

■ The rule against change of theory, on which the majority opinion bases its refusal to consider the issue of abandonment, applies fully to the plaintiff in error, but only to a limited extent, if at all, to the defendant in error. First Nat. Bank v. Hinkle (1917) 65 Okla. 62, 162 P. 1092. The rule applying to a defendant in error is that where the judgment is correct upon any theory sustained by the record, it will be affirmed no matter how erroneous the reasons are upon which the judgment was based, or upon which the prevailing party seeks to sustain it. This rule is based upon the harmless error doctrine enjoined upon us by our statutes. Sections 252, 388, and 3206, O. S. 1931 (12 Okla. St. Ann. secs. 78, 636, and 22 Okla. St. Ann. sec. 1068); Douglas v. Douglas (1936) 176 Okla. 378, 56 P.2d 362; 2 R. C. L. 189; 4 C. J. 662; 4 C. J. S. 488. This rule is particularly applicable where, as here, the action is one in equity (3 Am. Jur. 367), for equity "always attempts to get at the substance of things, and to ascertain, uphold and enforce rights and duties which spring from the

real relations of parties." Robbins v. Warren (1924) 104 Okla. 255, 230 P. 929.

It is immaterial that the petition does not specifically allege an intention of the defendant to abandon, since the evidence upon which the theory of abandonment may be sustained was introduced without objection, and largely by defendant's own witnesses, and the pleadings will be considered as amended to conform to the proof. O'Neill v. Harper (1937) 182 Okla. 52, 75 P.2d 879. We should, therefore, consider the issue of abandonment.

■ There are certain rules as applied to the law of abandonment of oil and gas leases which are settled in this jurisdiction: First, abandonment does not require an actual physical relinquishment of the premises as applied to the intangible rights created by the oil and gas lease, but is a question of intention. Fox Petroleum Co. v. Booker (1926) 123 Okla. 276, 253 P. 33; Hudspeth v. Schmelzer (1938) 182 Okla. 416, 77 P.2d 1123. Second, the intention to abandon may be inferred from the acts and conduct of the lessee as well as from express declarations, and an unreasonable delay on the part of the lessee in the further development of the premises, together with the lessee's declaration that further drilling would be unprofitable, is evidence from which the intention to abandon may be inferred. Fox Petroleum Co. v. Booker. supra; Wing v. Edwards (1936) 175 Okla. 642, 54 P.2d 351. Third, there may be abandonment of a portion of an oil and gas lease as well as of the whole lease. Wing v. Edwards, supra; Fox Petroleum Co. v. Booker, supra.

In the petition for rehearing and in the amici curiae briefs, it is argued that there can be no abandonment where there has been no breach of the implied covenant to reasonably develop. But the doctrine of abandonment is not dependent upon the breach of any duty imposed by law; rather it is dependent upon the intention of the lessee as disclosed by the facts and circumstances of the particular case. The two theories are separate and distinct, and should not be, but too often are, confused in the opinions. To follow the argument referred to would be to repudiate entirely the doctrine of abandonment without physical relinquishment.

Here the lease covering 20 acres was executed in 1916 and the primary term expired in 1918. Because of the litigation referred to in the majority opinion the lessee was under no obligation to drill further wells until that litigation terminated in

1923. No well has been drilled on the lease since April, 1925, at which time the second well was drilled on the north ten acres. The defendant acquired the lease in 1931 with full knowledge of the state of development thereon, for at the time it purchased the lease it requested the plaintiffs to confirm the same, which they refused to do. This request must have been on the theory that the plaintiffs had just cause for complaint because of failure to fully develop the lease. This action was commenced in December, 1933, and ten months before its commencement the owner made a demand upon the defendant for further development, but it refused to comply with such demand. Although the lease has been in force now for more than 22 years, with an obligation to fully develop for more than half that time, and the south ten acres has, since 1922, been surrounded on all sides by producing oil wells, resulting in substantial drainage from the ten acres, no well has been drilled thereon and the defendant's excuse for not doing so is that the geological data and the production from the wells on the adjoining land will not justify it in going to the expense of drilling a well on this ten acres.

Under these circumstances and the foregoing authorities, I think we should hold that there has been an abandonment of the lease on the south ten acres. It is inequitable for the defendant to refuse to drill or to surrender so that the owner may secure someone else to drill. If the geological data of the defendant is sufficient to relieve it of the burden of the implied covenant of further development, it does not seem unfair to require it to back up its data by relinquishing the undeveloped portion of the lease and giving the lessor the opportunity to make other arrangements for development. It is because of the injustice in such a situation that we have recognized in this state the law of abandonment. The Supreme Court of Kansas and the Supreme Court of the United States, recognizing the unfairness in a like situation, have decreed cancellation of the undeveloped portion of an oil and gas lease because of breach of an implied covenant to further develop without requiring proof that further development would probably result in a profit to the lessee, and indeed where the proof on the part of the lessee was that further development would not be profitable to it. McCarney v. Freel (1926, Kan.) 246 P. 500; Sauder v. Mid-Co Pet. Corp. (1934) 292 U. S. 272, 54 S. Ct. 671, 93 A. L. R. 454. In none of the cases relied upon by the majority opinion was the time element emphasized, as in the Sauder Case, the Wing Case, and the Fox Petroleum Company Case. See note on this subject in 93 A. L. R. at page 469.

The Sauder opinion was concurred in by Justice Van Devanter, who as a member of the Circuit Court of Appeals wrote the opinion in the Brewster Case, on which the rule contended for in the majority opinion in the instant case is based. Thus, the author of the Brewster decision, as well as the other Justices of the Supreme Court of the United States, saw no conflict between the Brewster decision and the Sauder decision.

But whatever may be the theory assigned, whether it be on the ground of breach of implied covenant, as in the Sauder Case, or on the ground of abandonment, as in the Fox Petroleum Company Case and the Wing Case, a court of equity will not permit the lessee to hold the undeveloped portion of an oil and gas lease, indefinitely and for speculative purposes, for an unreasonable length of time after the primary term has expired. Under such circumstances, it is inequitable for the lessee, by his refusal to develop or to surrender, to prevent the owner from getting full development of his property.

I do not believe the judgment of the trial court has resulted in a miscarriage of justice justifying a reversal under section 3206, O. S. 1931; rather I think the equities are in favor of the judgment of the trial court.

I therefore respectfully dissent to the majority opinion.

I am authorized to say that OSBORN, C. J., and RILEY, J., concur in this opinion.