## COLPITT v. TULL et al.

No. 33632.   July 18, 1950.
Rehearing Denied Feb. 20, 1951.
Application for Leave to File Second
Petition for Rehearing Denied
March 27, 1951.

*228 P. 2d 1000.*

W. E. Green, J. C. Farmer, Robert L. Woolsey, and Otho Flippo, Tulsa, for plaintiff in error.

A. R. Swank and A. R. Swank, Jr., Stillwater, for defendants in error.

O'NEAL, J. This is an appeal from a decree canceling, in part, an oil and gas lease covering lots 4 and 5 of the northwest quarter of section 6, township 19 north, range 7 east of the I.M., in Creek county. The decree cancels the oil and gas lease as to all the land, except ten acres (40 rods square) in the northwest corner of said 80-acre tract.

Vida M. Tull and I. A. Tull, wife and husband, are the owners of the surface rights in and to said 80-acre tract of land and an undivided one-half of the oil, gas and other minerals therein, and Mable Dale Potts and Dr. J. R. Potts, wife and husband, are the owners of the other undivided one-half of the mineral rights. C. R. Colpitt was the owner of an oil and gas lease covering said 80-acre tract.

The record shows that on March 2, 1926, Vida M. Tull and I. A. Tull, wife and husband, and George Harlow and Lula Harlow, the then owners of said land and the mineral rights therein, executed and delivered an oil and gas lease to John H. Markham, Jr., covering said land; that Mable Dale Potts and Dr. J. R. Potts thereafter became the owners of the interest of George and Lula Harlow; that through various intermediate assignments, defendant C. R. Colpitt became the owner of said oil and gas lease. Said lease is on the ordinary 88 form and by its terms was to extend for a period of three years from the 2nd day of March, 1926, and as long thereafter as oil, or gas, or either of them, is produced from said land by lessee, his successor or assigns.

Petition of plaintiffs alleges that defendant forfeited his right to said lease for three reasons:

"(a) The said term of three (3) years from the 2nd day of March, 1926, for which the said lease was to extend unless oil and gas or either of them were produced has expired.

"(b) That during all of the time from the 2nd day of March, 1926, to and including the 20th day of December, 1946, a period of more than twenty (20) years, only one well has been drilled on said land to a shallow sand found at approximately the depth of 2800 feet to what is known as the Bartlesville Sand, and that said well has produced during the entire twenty years period and has paid for itself many times over but that the defendant has failed, refused and neglectd to drill any other or further wells on said eighty acres tract.

"(c) That the defendant has failed, neglected and refused to diligently develop and operate the said lease; that plaintiffs were reasonably entitled to have additional wells drilled on said lease during the time intervening from the execution of the lease to the present time and also to have deeper sands explored, as well as to have the lines protected by offsetting wells."

The petition further alleges:

"That the plaintiffs for the reasons above stated have verbally notified the defendant that a forfeiture of the said oil and gas mining lease had been declared."

Defendant answered admitting that he was the owner of the oil and gas lease and neither admitting nor denying that plaintiffs were the owners of the land and mineral rights as alleged. The answer further alleged that there have been no offset wells drilled which would drain the land; that there has been and is now production from said lease and there has been such production from the time of the drilling of the first well within the primary term of the lease, and that plaintiffs have been receiving their royalty payments therefrom; that there is no implied obligation to drill any further wells than the one already on the land until it has been shown that there is drainage, or that there are commercial quantities of oil in the present producing horizon, or others, which have not been explored; that in this connection, from all the scientific and geological data available, there has been no probable belief among oil men that any other well of consequence could be drilled which would be profitable to defendant from a commercial standpoint, and therefore should have been drilled. The answer then specifically denies that defendant has neglected and refused to diligently operate the said lease, or develop same, and denies that under the circumstances plaintiffs are entitled to additional wells on said lease.

The answer further alleges:

" . . . But in that connection this defendant shows the Court that if this Honorable Court, after hearing the evidence in this case, finds that there should be additional development on this lease, that this defendant is entitled to reasonable time within which to commence such development, before having his lease or any part thereof canceled. And, in that connection shows the Court that this is an 80-acre lease. There is a well on 10 acres that has been producing ever since shortly after the giving of this lease and the royalty has been paid, and that under any circumstances this defendant is entitled to retain said well site and location, with his valid and subsisting oil and gas well thereon, and that if the Court should believe that additional development should be had, before canceling said lease that a reasonable chance and opportunity should be granted to this defendant to further develop said lease, so as to keep this contract in full force and effect before any forfeiture be worked or declared against this defendant."

Reply was by general denial. Trial to the court resulted in a decree as above stated, and defendant appeals.

Defendant in his answer prays that in the event the trial court, after hearing the evidence, should find there should be additional development on the lease, he be granted "a reasonable chance and opportunity" to further develop the lease. In his testimony he

stated that it was his desire to and that he was willing to drill another well on the lease; that some time back he had considered drilling another well on the lease and had talked to a contractor about it. But that is as far as defendant's evidence goes in that regard.

The defendant does not urge consideration of that alleged right either in his original brief or reply brief. He rests his case on the proposition that plaintiff failed to show any right to cancellation, or partial cancellation, either alternatively or peremptorily. Therefore, having failed to urge the proposition in his brief, he waived it and it need not be considered.

There are nine assignments of error presented under three propositions. The first proposition is:

"Although there is an implied covenant to drill such wells as are reasonably necessary it must be affirmatively shown that the drilling of additional wells will be profitable."

The case cited and relied upon by defendant is Hudspeth et al. v. Schmelzer, 182 Okla. 416, 77 P. 2d 1123, wherein it is held:

"The essential requisite of abandonment of an oil and gas mining lease is an intention on the part of the lessee to relinquish his interest in the premises, and the intention is to be determined from the facts and circumstances surrounding each particular case."

That case has no application here for the reason that plaintiffs are not relying upon abandonment for cancellation of the lease. The allegation of the petition upon which the decree is based was that the defendant has failed, neglected and refused to diligently develop and operate said lease. That was the reason for the decree as shown by the statement of the trial court after argument of counsel at the close of the evidence. There the trial court said:

"By the Court:—Plaintiff acquired the land in 1938 and Mr. Colpitt has had the lease for about 9 years. He hasn't diligently undertaken to develop the land under his lease for oil and gas. There's an implied contract to the effect he will develop it with due diligence. . . . He got production in the first well—pretty fair production, and he has been getting production from that one well for many years. He hasn't diligently tried to develop this land under his implied warranty."

The question of abandonment is not in this case.

Under the same proposition defendant asserts that there is nothing in the evidence of plaintiff to show that a reasonably prudent operator would have done more than defendant, Colpitt, had done; that the rule is that the lessee must do what a reasonably prudent operator would do under like conditions, and that the burden of proof was upon the plaintiff to show that additional wells would have been profitable and that a reasonably prudent operator would have drilled additional wells on the land. Defendant cites Ramsey Petroleum Corporation v. Davis et al., 184 Okla. 155, 85 P. 2d 427, wherein it is held:

"The burden of proving a breach of implied covenants to drill additional oil and gas wells to protect the lease premises from drainage by wells on adjoining lands is on the lessor."

In the opinion it is said:

" . . . Yet unquestionably the prevailing test in this state is the ordinarily prudent operator standard."

In Doss Oil Royalty Co. v. Texas Co., 192 Okla. 359, 137 P. 2d 934, it is said:

" . . . 'the statement that the implied covenant for further operations is limited to cases where there is likelihood of profit to the lessee must be taken in a restricted sense and is not of universal application. It will depend upon the facts and circumstances of the particular case.' The broad rule as to the burden of proof stated in Ramsey Petroleum Co. v. Davis, above, is not to be applied after the lapse of an unreasonable length of time."

In McKenna et al. v. Nichlos et al., 193 Okla. 526, 145 P. 2d 957, Doss Oil Royalty Co. v. Texas Co., supra, is cited, and it is pointed out that it was therein stated:

". . . that while in determining such matter, we would consider the question of the likelihood of profit from further drilling, we would also give weight to other considerations, particularly the length of time which the lessee had held the lease without further development. In other words, after the passage of a reasonable length of time, the duty to drill additional wells becomes progressively greater, and the standard of the prudent operator becomes progressively of less importance in determining whether such duty exists."

Therefore, when there is an unreasonable delay in drilling additional wells plaintiff is not required to prove that additional wells would have been profitable.

In the instant case the trial court pointed out that the oil and gas lease here involved had been in existence approximately 20 years; that the primary term thereof was three years; that within the primary term the lessee got fair production in the first well and had been getting production from that one well for many years. The evidence shows that the one well, drilled some 20 years before this action was commenced, was drilled in the extreme northwest corner of the 80-acre tract 90 feet south of the north line and 90 feet east of the west line, and that no other well had been drilled on the land. The trial court did not in so many words say that 20 years would be an unreasonable delay, but it is clear that the decree was based upon that theory. There was evidence of unnecessary delay sufficient to relieve plaintiffs from the burden of showing that additional wells would have been profitable.

The second proposition is that in order to invoke the doctrine of implied covenant to drill additional wells there must be a demand to fulfill the requirements of the implied covenant, and that lessor cannot maintain an action for the breach thereof unless the lessee has been given reasonable notice to fulfill the requirements. In this case the evidence clearly shows reasonable notice. The record shows that as early as September 29, 1934, plaintiffs wrote the J. H. Markham Oil Company, the then holder of the oil and gas lease, calling attention to the fact that the one well on the land had been producing for six years, and then stating:

" . . . If your company has no intention of drilling another well, would you be willing to turn back all of the lease with the exception of five acres where the well is located."

On April 15, 1938, plaintiffs wrote defendant, Colpitt, as follows:

"April 15th, 1938

"Mr. C. R. Colpit,
    "Collinsville, Okla.

"Dear Sir:

"According to the records you own the well and the major portion of the production on the West 1/2 of Section 6-19-7 East Creek County, Oklahoma. I am interested in getting some further developement (sic) done in this locality, and since you and your associates seem to be satisfied with one well, I thought perhaps you would not mind releasing all but the ten acres where the well is located.

"I will appreciate it very much, if you will take this matter up with Mr. Schoenfeld, and give me an early reply."

On April 21, 1938, defendant, Colpitt, replied to said letter stating in part:

"I am glad to have received your letter, as I am contemplating abandoning a number of wells in that area, and owing to the fact this is a lone well also a very light producer, I do not feel that it hardly justifies operation."

On April 26, 1938, plaintiff Tull again wrote defendant concerning the matter to the effect that since defendant was apparently intending to abandon and plug the well, if defendant would release the full 80 acres, plaintiff would

enter into a contract allowing defendant the privilege of plugging the well and removing his equipment at defendant's convenience, and then offering to buy the equipment at second-hand prices.

July 30, 1938, defendant, Colpitt, replied to that letter to the effect that he was not interested in selling the lease. September 10, 1938, plaintiffs, by their counsel, wrote defendant, Colpitt, as follows:

"September 10, 1938

"Mr. C. R. Colpitt
"Oil Well Supplies
"P. O. Box 175
"Collinsville, Oklahoma

"Dear Sir:

"Since receiving your letter of July 30, I have expected to hear from you further as to whether your associate, Mr. Schoenfeld is interested in selling this lease. If you have heard from Mr. Schoenfeld I shall appreciate it if you will let me know what conclusion he has come to. The fee owners of this land are anxious to get this settled one way or another.

"If you do not want to sell the lease, including the equipment in the well, then we would like to know, if you are willing to release the lease except as to ten (10) acres around the well. If you are unwilling to make a satisfactory price for the lease, including the well and its equipment; or, if the alternative, are unwilling to release the lease except as to the ten acres around the well, then the fee owners will expect to proceed to cancel the lease except as to the ten acres."

"Please give this letter your prompt attention."

October 16, 1946, plaintiff I. A. Tull wrote defendant as follows:

"Mr. C. R. Colpit
"Collinsville, Okla.

"Dear Sir:

"Since there is considerable activity in the vicinity of 6-19N-7W of Creek County, I would appreciate you and your associates making a release on the W 1/2 of Sec., 6-19N-7W, less the ten acres your well is located on.

"Thanking you for an early reply, I am,

"Yours truly,

"I. A. Tull"

Defendant denies having received the letter of October 16, 1946, but admitted having received all the others. While there is no direct demand to drill or surrender the lease, the letters are such as to show clearly that plaintiffs desired additional development, and that defendant did not think that additional operation would be advisable. It thus appearing that defendant did not think additional drilling to be advisable, counsel for plaintiffs wrote defendant that if defendant was unwilling to sell at a fair price and unwilling to release the land except as to the ten acres around the well, "then the fee owners (plaintiffs) will expect to proceed to cancel the lease except as to the 10 acres". Even then plaintiffs waited for more than eight years before commencing this action. There was sufficient notice and request for fulfillment of the implied covenants.

The third proposition, in substance, is that by accepting royalties from the one producing well for ten years and failure to demand further drilling, their mere requesting a release of the lease will be deemed to have waived the right of cancellation.

Defendant cites no case that accepting royalty for any length of time is a waiver of the right to demand cancellation for failure to develop other parts of the land. Plaintiffs did seek cancellation of the lease as to the whole 80 acres. But the decree denied cancellation as to the ten acres within which the well was located. Under principles of equity the trial court denied cancellation as to that ten acres. There was no waiver of the right to demand cancellation as to that part of the lease other than the ten acres surrounding the well.

Affirmed.

294

DAVISON, C.J., ARNOLD, V.C.J., and CORN and LUTTRELL, JJ., concur. WELCH, GIBSON, HALLEY, and JOHNSON, JJ., dissent.

HALLEY, J. (dissenting). The majority opinion is based upon the case of Doss Oil Royalty Co. v. Texas Co., 192 Okla. 359, 137 P. 2d 934, decided by this court in 1943. For approximately thirty years prior to that decision, this court had adhered to what is generally referred to as the "reasonably prudent operator rule" in determining whether or not a lessee forfeited his leasehold rights, after initial production in paying quantities had been obtained, by failure to further develop by drilling additional wells. Until the Doss decision in 1943, the prevailing rule was that to justify cancellation of all, or all except the portion where producing well was located, depended upon whether or not, under the facts and circumstances of each case, a reasonably prudent operator would have drilled additional wells with reasonable expectation of profit; and that if such operator would not have developed further, then there was no breach of the implied covenant to fully develop, and no cancellation of the lease, or the undeveloped portion thereof, was justified. The prior ruling of this court is aptly expressed in Ramsey Petroleum Corp. v. Davis, 184 Okla. 155, 85 P. 2d 427, handed down in 1938. In the second syllabus of that opinion it is said:

"The test for determining whether there is a breach of implied covenants to drill additional oil and gas wells to protect the lease premises from drainage by wells on adjoining land is the 'ordinary prudent operator test.' "

In the body of the opinion, it was said:

"In view of the nature of the factors to be considered, it may be said, generally speaking, that the lessor, in order to prove the breach of a covenant to drill additional wells, must show that the additional well would probably produce sufficient to repay the expense of drilling, equipping and operating such well and also produce a reasonable profit on the entire outlay."

The reasonably prudent operator rule is recognized and followed in Kansas and Texas, two oil-producing states adjoining Oklahoma, and since the decision of this court in the Doss Oil Royalty Co. case, supra, in 1943, that rule has been ignored in a number of decisions by this court. In the Doss case it was stated that there are three theories upon which courts of equity base their justification of the cancellation of the undeveloped portions of an oil and gas lease, leaving the lease in effect as to the portion where a producing well is located. These theories are: abandonment; breach of an implied covenant, without requiring proof that additional wells may be drilled with reasonable expectation of profit to the lessee; and broad equitable grounds, without naming any theory. The abandonment theory where the lessee has not relinquished physical control of the undeveloped portion of the lease was discounted. The lessors in the Doss case had sought relief upon the ground of abandonment, but relief was granted upon the ground of implied covenants to diligently develop. In the body of the opinion it was said:

"To permit the lessee to hold the lease for an unreasonable length of time for merely speculative purposes, is to allow him to protect his own interest and to disregard the interest of the lessor. If conditions do not indicate to him that further development will be profitable, it is but fair that, after a reasonable time has expired, he surrender the undeveloped portions of the lease and allow the lessor to procure development by others or assume the burden of showing why in equity and good conscience the undeveloped portion should not be cancelled so that the owner may, if possible, get it developed by others."

The foregoing statement clearly puts upon the lessee the burden of proving that additional wells should not be drilled, if a number of years have elapsed since the drilling of a producing

well or wells, and relieves the lessor of proving that additional wells may be drilled with a reasonable expectation of profit to the lessee and lessor. In other words, after the lapse of a reasonable time after a producing well has been drilled, and regardless of a reasonable expectation that profitable production will result from further drilling, the lessee must surrender the undeveloped portion of the lease and give the lessor an opportunity to find a lessee who will agree to drill without regard to the "reasonably prudent operator rule," under which the great oil fields of the nation have been developed. It is a generally accepted rule that the location and number of wells to be drilled under the usual oil and gas lease have been left to the judgment of the lessee, in the absence of an express agreement to the contrary. Since 1926 the producing well in the case at bar has produced slightly over $81,000 worth of oil and gas. The cost to the lessee is not shown, but the lessors admitted that it was not a very profitable well. In 1938 one of the lessors wrote to the lessee and said: "I realize the well is not a profitable one, as I own *one two* locations from you." The attorneys for the lessors wrote the lessee, Colpitt, and said: "A number of years ago you drilled a well on this land which has been producing up to the present time and is now producing probably a little more than enough to cover the cost of pumping and maintaining the well." Production from this well was very low in the early part of 1941, but had gradually increased since that date, as had the price of oil, and shortly before the trial a producing offset well had been drilled. These facts led the lessee to offer to drill at least one more well, but this offer was denied and his lease canceled as to 70 acres, leaving only ten acres around the one producing well.

While it is a well established rule that courts of equity have the power, authority and jurisdiction to cancel contracts, it is equally as well settled that where a contract has been fairly entered into, and is free from fraud, accident, mistake, or any other circumstance recognized as a ground for equitable relief, a court of equity must give full force and effect to such contract. In 30 C.J.S., Equity, §62, it is said:

"A court of equity cannot, as appears in Sec. 296 of the title Contracts, make a contract for the parties, nor vary the terms of one made, nor substitute another one therefor, nor can it remedy a wrong by making it effect a contract between the parties with reference to the subject matter. The mere fact that for one of the parties the contract was unwise or improvident, or that its enforcement is harsh, when it was so intended to be, does not alter the rule . . . ."

In Plains Petroleum Corp. v. Fine, 174 Okla. 570, 51 P. 2d 284, this court said:

"Wherever the rights of parties to an action are clearly defined and established by law, equity has no power to change or unsettle such rights, but in all such instances the maxim 'equitas sequitur legem' applies."

The same rule was announced by the Supreme Court of the United States, in Magniac v. Thomason, 15 How. 281, 56 U. S. 299, 14 L. Ed. 696, wherein it is said:

"That wherever the rights of the situation of the parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim 'equitas sequitur legem' is strictly applicable."

An "implied covenant", such as is relied upon by the plaintiffs in this action, is defined in 21 C.J.S., Covenants, §9, p. 888, as follows:

"An implied covenant is one inferred or implied in law from the words used and is based on the presumed intention of the parties. Such covenants are not favored."

The oil and gas lease sought to be canceled, and canceled by the judgment

of the trial court, except as to ten acres, clearly provides that it shall remain in effect as long as oil and gas or either of them is produced in paying quantities. It was admitted that this clearly stated provision was being met by production. We should not approve cancellation of any part of such lease, under existing conditions, in the absence of proof that additional wells could be drilled with reasonable expectation of profit.

I am of the opinion that the "reasonably prudent operator" rule, as announced in numerous decisions of this court prior to the rule set forth in the Doss Oil Royalty Co. case, supra, in 1943, is more just and equitable than the rule announced in that case, and that no lessee should be required to surrender the undeveloped portion of a producing lease on the ground of the breach of an implied covenant to fully or diligently develop, until the lessor pleads and proves that further development may be reasonably expected to result in additional profitable production, or that a reasonably prudent operator would develop further with reasonable expectation of profit to himself and the lessor. Our decision in the Doss Oil Royalty Co. case should be overruled, along with all subsequent decisions in accord therewith, in so far as they affect the cancellation of oil and gas leases, or a part thereof, where production in paying quantities was secured during the primary term of the lease, and is continuing, without the requirement of proof by the lessor that further development may be reasonably expected to result in profitable production.

I also disagree with the majority opinion wherein it says:

"No direct specific demand for additional development of an oil and gas lease is necessary . . . ."

This is contrary to our holding in Hudspeth v. Schmelzer, 182 Okla. 416, 77 P. 2d 1123, wherein it was held:

"It is a settled rule in the law of oil and gas that in a case of a breach of an implied covenant to properly develop an oil and gas lease the lessor must demand that the implied covenant of the lease be complied with, and a reasonable time thereafter be given, before a court of equity will grant a forfeiture. Wapa Oil & Development v. McBride, 1921, 84 Okla. 184, 201 P. 984; Papoose Oil Co. v. Rainey, 1923, 89 Okla. 110, 213 P. 882; Farmers' Mutual Oil Leasing Co. v. Bonneau, 1925, 110 Okla. 168, 237 P. 83; Utilities Producing Corp. v. Riddle, 1932, 161 Okla. 99, 16 P. 2d 1092; Gypsy Oil Co. v. Champlin, 1933, 163 Okla. 226, 22 P. 2d 102."

I submit that the evidence in this case does not reveal any specific demand for additional development of the oil and gas lease in question; and I am definitely of the opinion that the letters which were written by Tull to Colpitt did not contain a specific demand for additional development.

I respectfully dissent.

I am authorized to say that Justices WELCH and GIBSON join in these views.