**B. C. SPARKS, Bettie S. Sparks, Wendell D. Sparks and Trudie S. Wymore, Plaintiffs,**

v.

**MIDSTATES OIL CORPORATION, Jerrold R. Golding, Mrs. Bernie L. Rose and Jan Marie Golding, Defendants.**

**Civ. No. 4138.**

United States District Court
E. D. Oklahoma.
Jan. 23, 1957.

---

Williams, Williams & Williams, Ardmore, Okl., for plaintiff.

Rosenstein, Fist & Mesirow, Tulsa, Okl., and Hulette F. Aby, Tulsa, Okl., for defendant.

WALLACE, District Judge.

The plaintiffs, B. C. Sparks, Bettie S. Sparks, Wendell D. Sparks, and Trudie S. Wymore, Oklahoma citizens, bring this action as mineral owners against Midstates Oil Corporation, a Delaware corporation, and Jerrold R. Golding, Mrs. Bernice L. Rose and Jan Marie Golding, all citizens of New York, to cancel certain portions of a 70 acre oil and gas lease because of defendants' failure as lessees to further develop and protect such lease against drainage. This lease is specifically described as the SE/4 of SW/4; the S/2 of NE/4 of SW/4; and, the NW/4 of NE/4 of SW/4 of Section 30, Township 2 South, Range 2 West, Carter County, Oklahoma. Plaintiffs, after proper written demand, now seek to cancel the SW/4 of SE/4 of SW/4 and the deep rights on all the remainder of

such land except the SE/4 of SE/4 of SW/4.

The lease in question was given on May 24, 1921, for a term of five years and as long thereafter as oil and gas is produced from the described land. Since 1922 the defendants (or their legal predecessors) have drilled and completed eight wells on this lease, seven of which are still producing. One or more wells has been drilled on each ten acre location, except the NW/4 of SE/4 of SW/4.[1] Up to November 21, 1956, these wells had produced a total of some 490,000 barrels of oil. Of these eight wells drilled only Nos. 3 and 8 penetrated the deeper sands. Well No. 3 although initially drilled to a total depth of 2,970, a depth sufficient to penetrate the First Lower Deese, was plugged back to 2,805 feet because of a bridging of the well which occurred when the casing was being shot off during attempted completion. No. 3 is producing from the First Carpenter (with possibly some production from the second Carpenter) all of the production being co-mingled as is customary in dealing with the various zones found to be productive in the Graham Field. Well No. 8 was drilled to a total depth of 3,985 feet and penetrated the First and Second Lower Deese zones.

Thus, the production from this entire lease has been primarily from the so-called shallow sand.[2] And, in turning to the implied covenants our inquiry is directed into two definable channels: (1) Has a breach occurred as to the shallow sands on the NW/4 of SE/4 of SW/4 where no well has been drilled? and, (2) Have the deeper sands generally, beginning about 2,774 feet been prudently developed and protected?

■■ As to the undeveloped 10 acres it seems certain that the lease should be cancelled as to the shallow sands. It has been over 30 years since these productive shallow sands have been known to be present. And, there has been drilling coupled with production on every other 10 acre tract in the entire quarter section. The mere fact this 10 acres was off-set to the immediate west by a small gas producer affords no justification for the non-development of these shallow sands. The entire lease has been very profitable to the lessees; and, they have been in possession of all pertinent data as to such sands for a number of years. In view of this inaction the court can only conclude that not only has the implied covenant to further develop been breached in the past,[3] but

1. Well No. 1 (SE/4 SE/4 SW/4) was completed 1-12-25 at depth of 2383'; Well No. 2 (SE/4 SE/4 SW/4) was completed 5-30-25 and then on 9-28-26 deepened to 2760'; Well No. 3 (SW/4 SE/4 SW/4) was completed 5-15-24 at depth of 2970'; Well No. 4 (SE/4 NE/4 SW/4) was completed 3-5-24 at depth of 2339'; Well No. 5 (NW/4 NE/4 SW/4) was completed 11-14-23 at depth of 2520'; Well No. 6 (SW/4 NE/4 SW/4) was completed 3-15-24 at depth of 2375'; and, on 6-4-24 deepened to 2635'; Well No. 7 (NE/4 SE/4 SW/4) was completed 9-15-24 at depth of 2586'; and, Well No. 8 (SE/4 SE/4 SW/4) was completed 10-13-54 at depth of 3985'.

2. There are some eleven sands in the Graham field where the lease in question lies. The so-called *shallow* sands in their descending order are: Permian; Upper Fusilinid; Lower Fusilinid; Up-

per Tussy; and Tussy. The *deep* sands are: Lower Tussy, First Carpenter; Second Carpenter; Morris; First Lower Deese; and Second Lower Deese.

3. As observed by this court in Blake v. Texas Co., D.C.Okl.1954, 123 F.Supp. 73, 77: " * * * Where there is no unusual equity present and the lessee has failed to drill additional wells for so long a period of time that the proof of number of years delay irrebuttably establishes the lessee's lack of diligence, the Court may deem the covenant breached and the lease forfeited without considering evidence on whether further development would have been profitable." See cases cited in footnote 13, at page 78. Also, see Merrill, Covenants Implied In Oil And Gas Leases 91 (Supp. 1955). However, cf. Kuntz, The Prudent Operator, 9 Okla.Law Rev. 255. Significantly, in the issue before the

that at the present time the defendants have no real intention to go ahead and develop these shallow zones in this NW/4 of SE/4 of SW/4.[4]

■■ The deeper sands pose a much more complex problem. In terms of time alone the period of non-development since real activity in the lower sands began in this area does not stand out. The earliest deeper wells in the immediate vicinity were drilled the latter part of 1953.[5] And, most of the deeper production was obtained in 1954 and 1955. In view of the marginal character of many of these vicinal wells the court does not believe that under all the circumstances there has been an outright breach of the implied covenant to further develop all these lower sands thereby calling for a blanket cancellation of the deeper sands. It cannot be said that the defendants have failed to act as prudent operators, considering the legitimate interests of both the lessors and the lessees [6] by failing to generally exploit the deeper sands on this lease. Although the operator's occupational hazard forever includes the element of chance [7] nonetheless, an operator is not required to *rush* recklessly into shot-gun development where no rational expectancy of profit exists.[8]

■ However, to completely dispose of all issues touching these deeper sands we must specially consider the two 10 acre tracts in this lease which are directly off-set by deep production, placing particular emphasis upon the implied duty to protect from drainage. The Oklahoma law has drawn no clean-cut distinction between the lessee's duty to develop and the duty to protect against drainage insofar as probable profitability is concerned. In fact, there is language which taken alone indicates that both duties are measured by the same standard.[9] Of course, the basic inquiry is the same; "what would a prudent operator do under the circumstances?" But further, it seems certain that upon principle the law should require a lessee to evince a higher degree of abnegation where drainage is occurring than where only further development is in view. If drainage is taking place and a lessee can reasonably hope for a well which will pay out, his failure to drill and engage at close quarters in a struggle for capture should be deemed something less than prudent.[10] However, without relying exclusively on this distinction the court is of the opinion that in any event the plaintiffs are entitled to some relief as to the deeper sands under the SW/4 of SE/4 of SW/4 (on which the No. 3 well is located).

In May, 1955, immediately to the south of this 10 acres, the Cobb No. 4 Bett was completed at a depth of 3,314 feet.[11]

court not only has there been inordinate delay in terms of years, but the evidence demonstrates a good likelihood that this 10 acres could have been developed profitably.

4. See Coal Oil & Gas Co. v. Styron, Okl.1956, 303 P.2d 965; and, Doss Oil Royalty Co. v. Texas Co., 1943, 192 Okl. 359, 137 P.2d 934.

5. These were drilled on the NE/4 of Section 31.

6. In this connection the evidence indicates that the cost of drilling in this immediate area is about $12.00 per foot. This price includes all costs from clearing location to putting the oil in the tanks.

7. The "rule was never intended to take the element of risk entirely out of oil lease development. A reasonable and prudent operator knows (and it is a matter of more or less common knowledge) that there is such an element, to a greater or lesser extent, in almost any well he might drill, whether in a so-called 'proven' area, or in a 'wildcat' area." Knight v. Herndon Drilling Company, Okl.1955, 296 P.2d 158, 164, 165.

8. See Trawick v. Castleberry, Okl.1954, 275 P.2d 292, 295; Texas Consolidated Oils v. Vann, Okl.1953, 258 P.2d 679; Cf. Magnolia Petroleum Co. v. Wilson, 10 Cir., 1954, 215 F.2d 317.

9. See Ramsey Petroleum Corporation v. Davis, 1938, 184 Okl. 155, 85 P.2d 427.

10. Read Merrill, Covenants Implied In Oil And Gas Leases (2d ed., 1940) § 110.

11. The Cobb No. 4 was drilled on the NW/4 of NE/4 of NW/4 of Section 31.

It came in with a daily production of 84 barrels and as of November, 1956, was producing 15 barrels daily. Such production is coming from the Morris and Second Carpenter at points below the deepest producing horizons in Well No. 3.[12]

Thus, there can be no question but what some drainage is occurring at the hands of the Cobb No. 4. Although the Cobb well is now only producing approximately ⅕ of its initial output, the evidence demonstrates that this well is a profitable one. In this regard it should be noted that wells completed in the Second Carpenter and Morris sands, in this area, rapidly decline in production for the first six or eight months; however, thereafter the wells generally level off in production and are comparatively long lived.

Off-setting No. 3 diagonally to the southwest is the Magnolia No. 22 Bennett completed in July, 1955.[13] The First Lower Deese, the Morris and the First Carpenter formations are not productive in this well; and, production comes from the Second Carpenter and Tussy. Originally, this No. 22 Bennett produced 163 barrels per day; as of November, 1956, it was producing 22 barrels daily. Although the production of this well has sharply declined none-theless this well will show some net profit.[14]

Admittedly, deeper development on such 10 acres doubtless will result in a comparatively small net profit to the operator. However, drainage is taking place and the defendants must either afford protection or give the plaintiffs an opportunity to protect themselves. Because of the undesirability of dividing sands of different depths between two different operators, the court will grant the defendants 60 days from the date of judgment to commence operations toward the deeper sands.[15] If the defendants do not so act the court knows of no way to effect justice other than to cancel the existing lease as to the SW/4 of SE/4 of SW/4 below the depth of 2722 feet.[16]

Plaintiffs also urge that the deeper sands under the SE/4 of NE/4 of SW/4 are being subjected to substantial drainage. However, this 10 acres is not in a position directly comparable to the 10 acres referred to previously. Whether or not sufficient drainage is occurring to require an off-set well to the deeper sands on this latter 10 acres will for the most part be determined by the future showing of the Duncan No. 1, an immediate 10 acre off-set to the east.[17] The Duncan No. 1 was brought in sometime in September, 1956, at a total depth

12. The First Lower Deese was penetrated but found unproductive.

13. This is located in the NE/4 of NW/4 of NW/4 of Section 31.

14. The well off-setting No. 3 to the west lends no strength to plaintiffs' claim. Such well, the Schermerhorn No. 1–A located on the SE/4 of SW/4 of SW/4 of Section 30, was in November, 1955, deepened to the Lower Deese and all formations from the Tussy to the Lower Deese were perforated. As of November 24, 1956, this well was producing 5 barrels of oil per day from all formations. It seems apparent that this well will not return a profit to the operator. Moreover, the plaintiffs have the mineral interest in the Schermerhorn No. 1–A and consequently can make no complaint as to possible drainage by such well.

15. " * * * And since the resulting operation of divided mineral interests from the same surface will be attended by many practical difficulties we believe that if such relief is to be granted at all, it should be done sparingly and confined to those cases where complete justice can be effected by no other means." McKenna v. Nichlos, 1944, 193 Okl. 526, 145 P. 2d 957, 960.

16. Immediately prior to the commencement of this action the defendants offered to execute and deliver to the plaintiffs a partial release of the oil and gas lease in controversy insofar as the same covered this 10 acres between the depths of 2975 feet and 3,500 feet.

17. The Duncan well is located on the SW/4 of SW/4 of SE/4 of Section 30.

of 5,500 feet. The initial production was 170 barrels per day; however, as of November 21, 1956, this well's daily production was down to 16 barrels. Doubtless, some drainage has occurred and is occurring. But, whether an off-set is required cannot be determined for a few more months. If the production from the Duncan well holds up it would appear that sufficient likelihood for at least a marginal well on the SE/4 of NE/4 of NW/4 would exist to require an off-set well to protect against this drainage. However, if the Duncan well continues to decline and it becomes evident it can never pay out the conditions would not require the defendants to drill to the deeper sands off-setting the Duncan well. In fact, under such circumstances a prudent operator would not drill a well to the deeper sand on the 10 acres in question in the absence of additional encouraging information not now possessed.[18] At this time there has been no breach of the implied covenants on this SE/4 of NE/4 of NW/4. However, if the Duncan well gives evidence of paying out, or more, and in the face of such the defendants fail to protect against drainage by an off-set well, they may well find the deeper sands under the SE/4 of NE/4 of SW/4 subject to cancellation.[19]

Within 10 days counsel should submit a journal entry which conforms with this opinion.

18. Other than this Duncan well the nearest development to this 10 acres insofar as the deeper sands is concerned is the No. 8 well on plaintiff's lease located two 10 acre tracts directly south. And, this No. 8 is a marginal well having initially produced 35 barrels daily when brought in during October of 1954. As of November, 1956, it was only producing 8 barrels per day. From the data now available, exclusive of the Duncan well, the commercially productive deeper sands seem to lie more to the south of the instant 10 acres with a thinning out toward the north.

19. Although certain language in some of the Oklahoma decisions can be construed to require an off-set well to protect against "substantial drainage" even

though admittedly the protecting off-set will never pay out, this court is of the present opinion that such does not represent the Oklahoma view. In order to avoid cancellation, the Oklahoma rule apears only to require off-set protection where at least a pay-out or net profit is reasonably likely. For an excellent discussion of this see Kuntz, The Prudent Operator, 9 Okl.L.Rev. 255, see in particular pp. 266, 267. For the related problem of whether damages but not cancellation may be awarded irrespective of possible profit by the protecting off-set see Merrill, Covenants Implied In Oil And Gas Leases § 112 (2d ed. 1940); and, Merrill, Permitted Drainage—The Sellers Case and Local Law, 4 Okl.L. Rev. 58 (1951).