SHELL OIL CO. v. HOWELL et al.

No. 35232.   April 21, 1953.

Rehearing Denied May 12, 1953.

*258 P. 2d 661.*

George W. Cunningham, Robert Hart, Gordon Watts, and Jesse M. Davis, Tulsa, for plaintiff in error.

Shilling & Shilling, Ardmore, for defendants in error.

BLACKBIRD, J. Defendants in error, owners of a 120-acre tract in what is referred to as the "Wildcat Jim" area of Carter county, Oklahoma, commenced this action as plaintiffs against the defendant, plaintiff in error herein, who is the assignee of an oil and gas lease on said tract, to cancel a major portion of said lease for breach of the implied covenant to further develop it. The parties will hereinafter be referred to as they appeared in the trial court. Defendants' appeal is from the trial court's judgment in the form of an alternative or conditional decree canceling the lease, except as to 10 acres immediately surrounding two hereinafter described shallow producing wells on the tract, unless, within 20 days, it agreed to, and thereafter did, drill on the undeveloped portions of the lease, specifically as follows: (1) a shallow well to be commenced within 60 days, and (2) a deeper well to be commenced within six months.

The facts are undisputed and the pertinent ones are as hereinafter set forth. Plaintiffs' ownership and defendant's lease cover the S.½ N.E.¼ and N.W.¼ N.E.¼ of section 18, township 2 south, range 2 west. The lease was originally executed and delivered by plaintiffs' predecessors in title to Wirt Franklin on November 21, 1925. Previous to the time defendant acquired the lease in 1949, two small wells had been drilled on it. The first one drilled in 1926, in the southeast corner of this L-shaped tract was located' on

the 10 acres described as the S.E.¼ S. E. ¼ N. E. ¼ and produced oil in meager quantities for a short time. The second well, which was drilled on the 10 acres immediately north of the first, was completed in 1936, as a small producer and at the time of the trial was producing only 2 barrels of oil per day. Previous to its acquisition of the lease defendant had conducted a preliminary geophysical survey of said area which was completed about the time it acquired the lease. It appears that the purpose of this survey and its subsequent work and study of the area was to determine the existence of an oil-bearing sand or formation at lower levels than any theretofore explored. Accordingly, the first well it drilled was to a depth of approximately 4,000 feet —some 1,400 feet below any known producing formation in that area. This well was located in the northeast corner of the L shaped tract on a 10 acres specifically described as the N.E.¼ N.W.¼ N.E.¼ of section 18. It was drilled to the lower horizons and plugged back and completed as a small producer at the 2,600 foot level, approximately the same depth from which the older well was producing. No further wells were drilled on the lease, but according to the evidence, the defendant continued its study of the area, and finally, about the time this suit was filed, arrived at the conclusion that the deeper production, if any, lay under a strata or geophysical "high", the center and highest part of which was southwest of the lease in question. From its information, defendant concluded that the southwestern portion of the lease might extend over the northeastern edge of this structure, but that the initial exploratory well should be drilled higher or nearer the dome of the "high" or top of the structure, at a location southwest of this lease. It estimated that a well to test this lower strata would probably cost $100,000, and because of this and the fact that it owned leases on less than 500 acres in the area, it began to contact other holders of leases over the "high" to seek their aid and financial assistance in drilling an exploratory well farther up on the "high" than plaintiffs' land extended. There was testimony to the effect that if this venture was successful in discovering oil in paying quantities, defendant entertained the idea of thereafter drilling a so-called "edge" well on the southwestern part of plaintiffs' tract.

On December 14, 1950, plaintiffs, through their attorneys, addressed a letter to the defendant company calling its attention to the fact that there were only two small wells on two 10-acre tracts of the lease, asserting that nothing had been done by way of developing the remaining 100 acres thereof, demanding that said company proceed at once with further development, and expressing a desire to be given a definite answer within 30 days, as to what the company proposed to do. Without further correspondence between the parties, the company took plaintiffs' demand under consideration and its division exploration engineer at Oklahoma City, Mr. Eyler, upon a review of the company's subsurface information, decided and recommended to its production manager, that an effort be made to contract with some other operator to explore the shallow depths on the undeveloped portion of the lease. Such a transaction or project is what, in the oil industry, is commonly termed and will hereinafter be referred to as a "farm out". Mr. Eyler testified that such a recommendation is the customary procedure of his department when he thinks the profit derived from such exploration will not be large. He also testified that where it was found impossible to get a satisfactory "farm out", the customary procedure was for him to re-examine or reconsider the question and make further recommendation as to whether or not the company should itself do the drilling, or relinquish the lease. In accord with Mr. Eyler's recommendation, Mr. Austin, of the defendant company's land department, contacted various persons we shall call "independent" op-

erators, who had shown an interest in the lease prior to the time Shell had drilled its well. Finally, on January 19, 1951, defendant obtained a written proposal from a Mr. Elmer Wahl to accept defendant's "farm out" proposition providing for the commencement of a well on the undeveloped portion of the lease within 60 days from the date of the signing of a contract, to a depth of 3,500 feet, to test the Des Moines formation. Plaintiffs commenced this action on the same day. During the next week thereafter, and before defendant filed its answer, it advised plaintiffs it could and would contract with Wahl for further development of the lease as described in the "farm out" proposal, and requested that they dismiss this action so it could go ahead and obtain such a contract with Wahl. Plaintiffs refused to accede to said request of the defendant, who thereupon filed a general denial for its answer to plaintiffs' petition.

One of the questions, and a decisive one, presented in defendant's appeal from the trial court's judgment of alternative cancellation, is whether said judgment is warranted on the basis of the facts herein.

Plaintiffs admittedly sought the application to this case of the rule in Doss Oil Royalty Co. v. The Texas Co., 192 Okla. 359, 137 P. 2d 934, where we held that the evidence that an oil operator had failed for an unreasonable length of time to develop certain portions of a lease was sufficient to withstand his demurrer to the lessor's petition for cancellation of the undeveloped portions of the lease. This was made evident when they rested their case as soon as they had established the dates and the locations of the previous drilling on the lease, without showing any established drilling pattern or spacing, or other circumstance, to indicate the need or advisability of drilling other wells on the undeveloped portions of the lease. As noted in Skelly Oil Co. v. Boles, 193 Okla. 308, 142 P. 2d 969, the notable result of our decision in the Doss case was to relieve the lessor from having to prove that further drilling would be profitable or was required under the "prudent operator" rule in a case where the lessee's delay in further development had been of "unconscionable" duration. We also said in the latter case:

"Just how long such delay can be excused as conscionable depends in each case upon the circumstances rather than upon the precise time which has expired. In view of the disposition of the lessee to investigate the possibility of other deeper producing sands in the area, the fact that such disposition was accompanied by actual investigations involving the expenditure of money and by negotiations with other operators for the purpose of sharing expenses of deep drilling tests, and in view of the fact that the lessee was still producing a number of wells on the leased premises, we are impelled to hold that the delay in this case was not unconscionable, which must appear in view of the absence of proof that the drilling would probably be profitable."

In this case there is no evidence or intimation that the drilling of other shallow wells on the undeveloped portions of this lease would be profitable and we have abundant proof of the lessee's disposition to investigate formations believed to exist at lower depths, as in the above-quoted case.

In their argument, plaintiffs emphasize the fact that the lease has been in existence for more than 25 years with only three wells drilled thereon, only one of which the defendant has drilled. However, it is important that this defendant was not assigned this lease until less than 15 months prior to the commencement of this action and did not complete its well until less than 6 months before this time. During this last 6 months it was probing and studying the possibility of obtaining worthwhile production from the deeper strata in that area. Incidentally, it is indicated that these studies were not completed until after this suit was

filed. The defendant's reluctance to expend any more of its own money on drilling to the shallow formation under this lease can well be understood. In some respects the facts here are similar to those in Hay v. Shell Petroleum Corp., Dist. Ct. W. D. Okla., 30 Fed. Supp. 663, in which it was said:

"It is the contention of the plaintiffs that the defendant Shell had no right to refuse a release if it did not want to drill. Under the terms of the lease, it had the right to defer drilling until the development could be made *in an ordinary and profitable* manner and if the investigation as to the probable production of the proposed Hay No. 2 was proceeding with reasonable definiteness and the defendant was not satisfied that it could drill the well and secure production sufficient in amount to meet the expenses of drilling, equipping and operating the well and in addition thereto produce a reasonable profit, then *it was under no obligation to do so. It could not, however, continue to hold the lease and refuse to develop the land* for an indefinite period or *for an unreasonable period* but since the suit was filed in less than twelve months after the demand was made, in view of the new processes which were being resorted to in the field to go to deeper sands, the court is of the opinion that the defendant Shell Petroleum Corporation did not abuse a reasonable discretion in refusing a release of the premises." (Emphasis ours.)

As to the above and related matters, see, also, Carter Oil Co. v. Mitchell (C. C.) 100 Fed. 2d 945.

He who seeks equity must do equity; and the fact that a lessor may have an opportunity to re-lease his land for a handsome new bonus is no more ground, in itself, for canceling the existing lease, than is the lessee's desire to hold the lease for speculative purposes, a ground for refusing such relief. That would be unfair to the lessee, who in this case has invested much more money in the lease than it apparently has any hope or chance of getting out of it without reasonable opportunity to explore deeper horizons in a prudent and financial practicable manner. Here, it would appear from plaintiffs' haste in filing this action and their arbitrary and unexplained refusal to dismiss it, when apprised of Mr. Wahl's proposal, that they may have had some other motive for their conduct than the desire for further drilling operations on their land. As said in Ferguson v. Gulf Oil Corp., 192 Okla. 355, 137 P. 2d 940:

"* * * It (the rule laid down in the Doss case) should not be used to permit a lessor to secure cancellation so that he may sell a new lease on the land at a speculative price made possible by large expenditures of a lessee in drilling near-by tests. Neither should it be used to penalize a lessee for the exercise of caution in the conduct of an expensive and hazardous enterprise, which if successful will aid both lessor and lessee."

Upon consideration of the undisputed evidence in this case, we think the facts here do not justify the inference that the defendant had abandoned any part of this lease, or established any cause for cancellation of the lease, and the trial court should have so concluded, wholly and unconditionally denying plaintiffs any such relief. Its judgment to the contrary is erroneous. Because of the growing tendency of litigants to rely on the periods of undevelopment appearing in reported cases like the Doss case, supra, to relieve them of introducing any evidence under the "prudent operator" rule, regardless of other circumstances, and despite the hereinbefore quoted language of the Skelly Oil Company case, we want it clearly understood that we do not intend nor purport to hold that a lessor's failure to drill for the period in question here may be permissible, or not ground for cancellation, under different circumstances. Obviously, a lessee may evidence n intention to abandon a lease or be held to have abandoned it, soon after his last drilling thereon. We merely hold that the failure of this lessee to drill during the period and under the circumstances shown here was not

ground for cancellation of the lease at the time of the trial. And we may add, as we did in the Skelly Oil Company case, supra, that our refusal to uphold the trial court's judgment does not mean that such delay as was here shown may not continue until it becomes unreasonable or unconscionable and thus grow into valid ground for cancellation of the lease at some time in the future. As a corollary, it follows that our decision herein should not be interpreted as licensing the defendant to do nothing in the near future toward further development of the lease. Nor should it be taken as a judicial declaration that defendant may not, within a short period, be responsible for conduct which, in law, would amount to an abandonment of the lease, or give just cause for its cancellation. On the other hand, we believe that said company should be free to use what devices it may have or be able to procure for the lease's further development, and not be shackled with a court order or judgment which nowhere therein provides, for the purpose it presumably is calculated to accomplish, any means for extensions of time for commencement of operations, if the necessity therefor should arise; and which, as is indicated by the evidence in this case, tends to cast a legal cloud or question of uncertainty as to the duration of the lease and to "chill" the inclinations of those who might assist the company in such project, thus limiting or restricting its opportunities of accomplishing further development in a competent and prudent manner.

The judgment of the trial court is hereby reversed, with directions to said court to set it aside and enter judgment for the defendant.

HALLEY, C.J., JOHNSON, V.C.J., WELCH, CORN, DAVISON, and WILLIAMS, JJ., concur. O'NEAL, J., dissents.