**BLAKE et al. v. TEXAS CO. et al.**
Civ. No. 3543.

United States District Court,
E. D. Oklahoma.
Aug. 4, 1954.

WALLACE, District Judge.

Plaintiffs, as mineral owners, bring this action against the defendant oil company for alleged breaches of the implied covenants to protect against drainage and to further develop; [1] plaintiffs seek damages for such alleged drainage and ask for cancellation of 150 acres of the 160 acre lease. The defendant denies it breached either of these implied covenants.

The submitted evidence established the following facts:

(1) An oil and gas lease for a primary term of ten years, covering the SE¼ of Section 21, Township 2 North, Range 8 West, Stephens County, Oklahoma, was executed in favor of Ed V. Parsons, lessee, on August 14, 1936. On October 5, 1936, this lease (herein referred to as Blake lease) was assigned to the defendant.

(2) On October 1, 1945, defendant commenced the Ruel Blake No. 1 well in the SW¼ of NW¼ of the Blake lease. Such well was completed as a producer in the Ruel Blake Sand (Cisco formation common source of supply) on January 9, 1946. The following September the well was re-completed as a producer of gas and distillate in the Upper Coline Sand (Cisco formation common source of supply).

(3) No delay rentals have been paid since the completion of the Ruel Blake No. 1 and no additional wells have been drilled on the instant lease. Since the expiration of the primary term on August 14, 1946, the entire 160 acres has been held by the defendant by virtue of the production from said well.

(4) The Ruel Blake No. 1 was completed by the defendant at an initial investment of $85,229. An additional $13,108 was spent in October of 1951 in re-completing this well. As of February 28, 1954, the total net revenue to the defendant, after various deductions, was

Rainey, Flynn, Green & Anderson, Oklahoma City, Okl., for plaintiffs.

Y. A. Land, Philip R. Wimbush, B. W. Griffith, Maurice A. Robinson, Tulsa, Okl., George F. Short, Oklahoma City, Okl., and Carlson, Lupardus, Matthews & Holliman, Tulsa, Okl., for defendants.

1. Merrill classifies these two covenants as "to drill offset wells" and "to drill additional wells". The two other covenants implied against the lessee are "to drill an exploratory well" and "to diligently operate and market". See Merrill, Covenants Implied In Oil and Gas Leases (2d Ed. 1940) §§ 14–117.

some $12,000 short of having repaid defendant's total outlay of expense.[2] At the present time this well is producing some 6 barrels of distillate and about 600,000 cubic feet of gas per day. Such production, the gross revenue from which is approximately $3000 per month, will retire the remaining deficit within a very few months and doubtless will continue for some period of time thereafter.

(5) The Oklahoma Corporation Commission on September 29, 1947, upon defendant's application, entered an order (No. 20414, Cause CD No. 1534) establishing 40-acre drilling and spacing units for three separate common sources of supply underlying all of Sections 16, 17, 20, 21 and the W½ of 22, Township 2 North, Range 8 West, Stephens County, Oklahoma. This order, which still is in effect, covered the upper Cisco, the lower Cisco and the Hoxbar formations. The order further provided that the permitted well in any of the three common sources of supply should be drilled in the center of the southwest ten acres of each quarter quarter section.

In defining what sands were included in the Hoxbar common source of supply the order stated: "That the third common source of supply underlying this area includes the upper Sears sand found at 6660 to 6713 feet, the lower Sears sand found at 6714 to 6813 feet and the Wade sand found at 7461 feet, and these sand formations constitute one common source of supply and are the Hoxbar formations of the sands of the Pennsylvania age."

(6) On about October 1, 1952, without obtaining a spacing order exception, the defendant drilled the Olson No. 3 well in the NE¼ of SE¼ of SW¼ of Section 21, a direct 10-acre offset to the SW¼ of the Blake lease and a 10-acre diagonal offset to the southwest of the Ruel Blake No. 1. The Olson No. 3 is producing from the Hoxbar formation at a depth of approximately 7,934 feet.[3]

(7) The Olson No. 3 was drilled, equipped and completed at a total cost to defendant of $150,999 and defendant has spent an additional $10,090 on working over. As of February 28, 1954, this well had produced 7,549 barrels of oil, having a total gross value of $17,747 and is currently producing about one barrel per day.[4] Although this well will never completely pay out the evidence indicates that said well can be plugged back to the upper Coline (the Coline sands are found at approximately 6150 feet) and thereafter produce gas and distillate comparable to the production of the Ruel Blake No. 1.

(8) The defendant has drilled six wells which immediately abut the Blake lease. These wells are the J. N. Bateman No. 2 in the SW¼ of SW¼ of NW¼, the M. A. Bateman No. 1 in the SW¼ of SE¼ of NE¼, the S. J. Helm No. 1 in the SW¼ of SE¼ of NW¼ and the H. V. Olson No. 1 in the SW¼ of NE¼ of SW¼, all in Section 21; and, the H. V. Olson No. 3 in the NE¼ of NW¼ of SW¼ and the Don Williams No. 1 (dry hole) in the SW¼ of NW¼ of SW¼, both in Section 22.

As of February 28, 1954, the total development and operating costs of the Ruel Blake No. 1 and the five wells and one dry hole just mentioned exceeded the total revenue to the defendant from said wells by $582,625. Up to the present time, of these seven holes only the Helm No. 1, which is producing from the upper and lower Sears sands, has paid out.

(9) On November 25, 1952, plaintiffs gave defendant notice to further develop the Blake lease and to protect said

2. Such deductions include the gross production and excise taxes, landowners' one-eighth royalty, operating costs, initial investment and workover costs.

3. The well was drilled originally to 8,012 and then plugged back to 7997. The producing sand is at two levels, from 7975 to 7985 and from 7934 to 7950. The source of production is some 500 feet below the Wade sand, the deepest sand named in the spacing order (See finding No. 5)

4. After producing some 8000 barrels the yield declined to about 4 barrels a day. At the present time this well is producing one barrel a day, as mentioned in the finding.

lease against offset drainage by commencing a well in the SW¼ of the instant lease within sixty days, or paying offset royalty or surrendering the undeveloped portion of the lease.

 Inasmuch as the evidence before the Court indicates little or no drainage from the Blake lease has taken place, the lessee's duty under Oklahoma law to protect against drainage need not be dealt with in detail. No evidence was introduced by the plaintiff establishing directly just what drainage, if any, has occurred due to the operation of the Olson No. 3, the only producing offset (see findings 6 and 7) whereas the defendant presented specific testimony that no drainage has taken place.[5] Although the Court believes it can take judicial knowledge that some drainage has occurred inasmuch as a 40-acre spacing has been established for the common source of supply found some 500 feet above the point from which the Olson No. 3 is producing and said Olson No. 3 is a 10-acre direct offset to the SW¼ of the Blake lease, which SW¼ according to defendant's own experts contains some oil, nonetheless there is no convincing proof of any substantial drainage.[6]

The paramount issue in the instant case is whether the defendant has breached the implied covenant to drill additional wells.

Although no attempt will be made in this opinion to copiously review all the various Oklahoma decisions touching upon this implied obligation of the lessee, the Court has made an effort to thoroughly consider the entire body of pertinent Oklahoma holdings.

 Where, as in the field of implied covenants, the underlying rationale is bottomed in equity understandably no inflexible norm can emerge from the line of decisions so as to be applicable in a "rule of thumb" manner. However, even the fundamental rule adopted in the early Oklahoma rulings, the ordinary prudent operator standard,[7] has been modified by later decisions dealing with the implied covenants; and, the problem immediately before this Court is to determine just

---

5. Witness Steinle testified that no drainage has occurred inasmuch as the Olson No. 3 is only draining about two acres.

6. As mentioned in Ramsey Petroleum Corporation v. Davis, 1938, 184 Okl. 155, 85 P.2d 427, 431: "(b) Regarding the duty to drill offset wells to protect against drainage, although generally the same factors should be taken into consideration, [as to the duty to further develop] yet an additional requirement is that the lessor prove that the adjoining wells are draining to a substantial amount (citing authority)." It is evident that little drainage, if any, of the lease in question has occurred due to the relatively slight total production of the Olson No. 3 (see finding No. 7). The evidence indicates that for the Olson No. 3 to get anything like substantial production it will be necessary to plug back to the upper Coline sand, the sand from which the marginal Ruel Blake No. 1 is producing. Although such a plug back would place the Olson No. 3 squarely within the purview of the spacing order and off pattern, up to now the Court does not believe the well can be deemed off pattern for the reason it has been producing from a sand some 500 feet below the deepest sand mentioned in the spacing order. (see finding 5)

7. "As to the covenant to drill offset wells and that to drill additional wells, two tests have been used by the courts, the 'good-faith' and the 'ordinary prudent operator' tests.

"The 'good-faith' test makes the lessee the final arbiter of whether the offset should be drilled, since he is paying all the costs and is taking all the risk. This may be unjust to the lessor, who, although he does not contribute to the cost, has an interest at stake. Under this test the lessor would be protected against a fraudulent refusal to drill, but not against an honest mistake of judgment. Consequently, the more acceptable test and the one adopted by most courts is that which requires the lessee to come up to the standard of the ordinary prudent operator under the circumstances, keeping in mind the interest of both the lessor and the lessee; that is, whether an operator of ordinary prudence, being apprised of the facts, would consider the venture a sound one. This calls for a reasonable expectation of a profitable return. * * *" *Oil and Gas Rights*, By Victor H. Kulp, Little, Brown and Company, Boston, 1954 § 10.72, p. 675.

how much and in what manner the prudent operator standard has been altered.

In 1951 Judge Murrah in the Trust Company of Chicago v. Samedan Oil Corporation opinion carefully reviewed all pertinent Oklahoma cases, decided up to the time of the writing of his opinion, and in summation made the following observation.[8]

"From these cases we take it that while the prudent operator theory is yet distinctly relevant to the question of due diligence, it is not the exclusive test; that although likelihood of profitable production may be a factor in determining what a prudent operator would do in the particular circumstances, it is not conclusive of the prudence of his conduct. Even a prudent operator must excuse his unreasonable delay. What constitutes an unreasonable delay 'depends in each case upon the circumstances rather than upon the precise time which has expired.' (Citing cases.) Thus, one year may be unreasonable in some circumstances, and ten years reasonable in others. *Predominate in all these cases is a conscientious effort to arrive at a just and equitable adjustment of the conflict of the parties to the lease, having in mind the rights and duties imposed by their contract, express or implied. In the ultimate analysis, the question lies with the Chancellor, guided only by the cardinal principles that govern the mutual duty of fair play.*" (Emphasis supplied.)

Although this Court believes Judge Murrah's conclusion remains an accurate appraisal of the law of implied covenants even to this time, decisions subsequent to the Trust Company of Chicago case, supra, tend to emphasize that the prudent operator rule remains the cornerstone in the implied covenants structure, subject, of course, to modifying equities.[9] Although it has been urged that the Doss Oil Royalty Company case,[10] and those cases peculiarly relying on the Doss case,[11] stand as authority for as many as three separate and distinct rules of law,[12] this Court has concluded that all such decisions can be merged into what may be termed a modified prudent operator test, a standard wherein the likelihood of profitable production remains a primary consideration but subject always to the bright light of equity.

■■■■ Fully appreciating the difficulty of stating a principle of law sufficiently comprehensive to cover all conditions of the lessee's duty to drill additional wells, particularly where some of the language of different Oklahoma decisions patently appears conflicting, the following is tendered as this Court's best effort to harmonize in resume the implied obligation of the Oklahoma lessee to further develop. (1) Where there is no unusual equity present and the lessee has failed to drill additional wells for so long a period of time that the proof of number of years delay irrebuttably establishes the lessee's lack of diligence, the Court may deem the covenant breached and the lease forfeited without considering evidence on whether

8. 10 Cir., 1951, 192 F.2d 282, 285.

9. See Shell Oil Co. v. Howell, 1953, 208 Okl. 598, 258 P.2d 661; Texas Consolidated Oils v. Vann, 1953, 208 Okl. 673, 258 P.2d 679; Trawick v. Castleberry, Okl.Sup.1953, 275 P.2d 292. However, cf. Gregg v. Harper-Turner Oil Co., 10 Cir., 1952, 199 F.2d 1.

10. Doss Oil Royalty Co. v. Texas Co., 1943, 192 Okl. 359, 137 P.2d 934.

11. See particularly Colpitt v. Tull, 1951, 204 Okl. 289, 228 P.2d 1000; McKenna v. Nichlos, 1944, 193 Okl. 526, 145 P.2d 957.

12. The three interpretations commonly urged are: (1) That the prudent operator rule has been repudiated by the Oklahoma Court and in its stead an absolute duty to further develop placed upon the lessee; (2) That merely the burden of proof has been shifted to the lessee although the governing rule remains unchanged; (3) That an express exception was made to the prudent operator, rule otherwise leaving such rule unaltered.

further development would have been profitable.[13] (2) Where there is proof of such delay in terms of time that under the circumstances a prima facie, though not irrebuttable, showing is made of unreasonable delay, the burden then shifts to the lessee to come forward with evidence to establish that although the time of delay appeared unreasonable that he at all times conducted himself as an ordinary prudent operator and that profitable further development was unlikely.[14] (3)

13. Although the Doss case, fn. 10, supra, did not itself stand for the proposition that a lease could be cancelled due to time delay alone, the language contained therein cut the first sharp inroad into the conventional prudent operator rule therefore followed. Justice Hurst, 137 P.2d at page 938 said: "* * * To permit the lessee to hold the lease for an unreasonable length of time for merely speculative purposes, is to allow him to protect his own interest and to disregard the interest of the lessor. If conditions do not indicate to him that further development will be profitable, it is but fair that, after a reasonable time has expired, he surrender the undeveloped portions of the lease and allow the lessor to procure development by others or assume the burden of showing why in equity and good conscience the undeveloped portion should not be cancelled so that the owner may, if possible, get it developed by others." The Court went on to conclude 137 P.2d at page 939: "* * * In this case fourteen years was an unreasonable length of time for the lessee to hold the undeveloped portions of the leases without drilling, in the absence of any showing of special circumstances justifying the non-development. * * *" In referring to the Doss decision the Court in McKenna v. Nichlos, fn. 11, supra, 145 P.2d at page 960, said: "In that case we pointed out that suits for the cancellation of oil and gas leases are governed by principles of equity, and that the question of whether a lessee has breached the implied covenant for further development is committed to the sound discretion of the courts, to be determined from the facts and circumstances of each case. We stated that while, in determining such matter, we would consider the question of the likelihood of profit from further drilling, we would also give weight to other considerations, particularly the length of time which the lessee had held the lease without further development. In other words after the passage of a reasonable length of time the duty to drill additional wells becomes progressively greater, and the standard of the prudent operator becomes progressively of less importance in determining whether such duty exists." Justice O'Neal in reviewing previous decisions in Colpitt v. Tull, fn. 11, supra, 228 P.2d at page 1003 concluded: "Therefore when there is an unreasonable delay in drilling additional wells plaintiff is not required to prove that additional wells would have been profitable. * * * The trial court did not in so many words say that twenty years would be an unreasonable delay, but it is clear that the decree was based upon that theory. There was evidence of unnecessary delay sufficient to relieve plaintiffs from the burden of showing that additional wells would have been profitable." Dr. Merrill in pointing out that Justice O'Neal went much further than merely shifting the burden of proof observed: "Hence we should not be misled by such statements as 'when there is an unreasonable delay in drilling additional wells plaintiff is not required to prove that additional wells would have been profitable.' Statements of this sort in the opinion refer not alone to the burden of coming forward with proof in a particular situation. They carry the meaning that the failure to drill for what the court deems an unreasonable time may show an infraction of the implied covenant for development which is not rebutted merely by proving that the odds are not in favor of a profit from additional wells. * * *" 5 Okla.Law Rev. pp. 456, 457 (1952). As recently observed by Justice Blackbird in Shell Oil Company v. Howell, fn. 9, supra, 258 P.2d at page 664: "* * * the notable result of our decision in the Doss case was to relieve the lessor from having to prove that further drilling would be profitable or was required under the 'prudent operator' rule in a case where the lessee's delay in further development had been of 'unconscionable' duration. * * *"

14. As mentioned by Justice Williams in Trawick v. Castleberry, fn. 9, supra, 275 P.2d 295: "Granting for purposes of argument only that an unreasonable length of time had passed in the instant case without the drilling of additional wells, plaintiffs still are not entitled to a cancellation of the lease in question, for reasons which are set out below. * * * We hold therefore that the defendant fully discharged the 'burden of the evidence' which shifted to it by virtue of the holding in Magnolia Petroleum Co. v.

Where the proof of delay in terms of time alone raises no presumption or prima facie case of unreasonable delay, the lessor must establish by a fair preponderance of the evidence that the lessee has failed to measure up to the standard of an ordinary prudent operator in the further development of the lease.[15]

Regardless what name be attached to the governing rule in Oklahoma, none of the Oklahoma holdings justify cancelling, at this time, the instant lease.

Although only one well has been drilled on the Blake lease, the defendant has invested considerable sums of money in the immediate area in an effort to intelligently, though not recklessly, develop the property in litigation and those properties immediately adjacent thereto. The one well drilled in the NW¼ of this Blake lease although now approaching the point of pay out has been but a marginal well. In addition the data known at this time condemns the entire E½ of the lease in question and the defendant certainly has breached no covenant in failing to drill in such 80 acres.[16] Although the SW¼ of the instant lease doubtless contains oil

Rockhold [192 Okl. 628, 138 P.2d 809], thereby taking this case out of the rule expressed in the Doss Oil Royalty case, and making the 'ordinary prudent operator test' as set out in the Ramsey Petroleum case * * * applicable. Under the ' "ordinary prudent operator" ' test, plaintiffs had the burden of proving that additional wells would probably produce oil or gas in sufficient quantities to repay the expense of drilling, equipping and operating such wells, and make a reasonable profit. As we have seen, there is a total absence of evidence for plaintiffs on this point. We therefore hold that under the 'ordinary prudent operator test,' the plaintiffs are not entitled to a cancellation of the lease in question."

As stated in Magnolia Petroleum Co. v. Rockhold, 1943, 192 Okl. 628, 138 P.2d 809, 810: " * * * Where production is obtained during the primary term of a lease, and it is disclosed that the lessee has failed and refused to fully develop the leasehold within a reasonable length of time and there has been unreasonable delay in development a prima facie case is made in an action by the lessor to cancel the undeveloped portions thereof and the burden is upon the defendant lessee to show that the lease has been developed in the manner reasonably to be expected of an operator of ordinary prudence. (Citing cases.)" Eleven years had elapsed in the Rockhold case without additional wells being drilled.

15. As stated by Justice O'Neal in the case of Texas Consolidated Oils v. Vann, fn. 9, supra, 258 P.2d at page 689: "The rationale of the cases leads us to the following conclusion: (1) Where in the Doss, McKenna, and Colpitt cases the additional development is long delayed a court of equity may, in a proper case, declare that the implied covenants of the lease for reasonable development have been breached and upon such finding cancel the undeveloped portion thereof. The decree is sustained by proof of mere lapse of time without more. (2) *Where from all facts and circumstances the delay in the additional development is not long delayed, but additional development is demanded by the lessor, the reasonable operator rule will apply.* Neither the lessor nor lessee is the arbiter of its application. The rule of law which this and other courts have uniformly followed is that *the lessor must establish the fact that additional development in all reasonable probability will result in profit to the lessee, over and above the costs of the development.*" (Emphasis supplied.) See also Ramsey Petroleum Corporation v. Davis, fn. 6, supra, 85 P.2d at page 428, wherein the Court in its Syllabus said: "2. The test prevailing in this State for determining a breach of the implied covenants to drill additional wells and to protect the lease premises from drainage by wells on adjoining lands is 'the ordinary prudent operator test'. It requires the lessee to do whatever in the circumstances would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, but neither is the arbiter of the extent to which, or the diligence with which, the operations shall proceed. *The burden of proving the breach of these implied covenants is upon the plaintiff.*" Also see Magnolia Petroleum Co. v. St. Louis-S. F. R. Co., 1944, 194 Okl. 435, 152 P.2d 367, as to plaintiff having burden of proof.

16. Witness Roberts testified that the entire E½ of the lease in question was on an unfavorably low structural position; in addition, a dry hole was completed in the SW¼ of NW¼ of SW¼ on the Don Williams tract immediately east of the Blake lease.

it cannot at this juncture be found that the defendant has breached the implied covenant by not drilling an additional well on such 40 acres.[17] As mentioned before, the one well on this lease, located on the 40 acres directly to the north, has been but a marginal well; and, the offsetting well to the west has produced very little oil and at best will never pay out.

■ Continued failure by the defendant to drill additional wells on the lease in question doubtless will ripen into a breach of its implied obligation. The defendant cannot forever choose to delay further development and at the same time prevent others from drilling. Should the total time of inactivity measured in years become unconscionable in and of itself, the plaintiffs will be entitled to oust the "dog in the manger". Also, should future data indicate that additional drilling is warranted the defendant will have to measure up to the standard of the prudent operator or forfeit its interest in the undeveloped portion of the Blake lease. However, the evidence up to this time and which is before the Court does not demonstrate that the defendant, in disregard to the rights of the lessors, has been guilty of dilatory tactics, unlawfully holding the lease for speculative purposes, not being willing itself to develop yet unreasonably barring others. Although a lessee must not be permitted to develop a lease solely in conformity with its own selfish financial interests, disregarding the legitimate rights of the lessors, certainly lessors cannot demand, in the absence of unconscionable delay, that the lessee either forfeit the lease or invest money in total disregard to the dictates of reasonable business prudence.[18]

■ The plaintiffs made a sufficient showing of time delay in further development under the circumstances of this case to shift to the defendant lessee the burden of establishing it has acted as a prudent operator taking into account the legitimate interests of all parties; however, the defendant has met such burden. In addition to establishing by convincing evidence that additional wells on the lease in question hold little likelihood of profit,[19] a consideration of prime importance

17. In regard to drilling to the upper Coline in the southwest corner of the Blake lease, witness Roberts stated it was questionable such a well would be at all productive because of the water level. Witness Foley testified that the most favorable location would be in the NW¼ of SW¼ of SE¼ of Section 21. Such a well although probably productive in all probability would not pay out inasmuch as from information now available the only producing sands above the water level are the Blake sand, the upper Coline and the Olson No. 3. Such a location would require the granting of an exception to the spacing order, except as to the Olson No. 3 sand. (see finding No. 5)

18. As stated by Justice Hurst in Ferguson v. Gulf Oil Corporation, 1943, 192 Okla. 355, 137 P.2d 940, 943, the author of the Doss opinion: "The rule laid down in the Doss case is to protect the lessor from the inequality of position that exists between the lessor and the lessee and to correct the inequity arising from the failure of a lessee to carry out the purposes for which the lease was given, yet it is a rule of equity and should be applied only where it will effectuate justice. It should not be used to permit a lessor to secure cancellation so that he may sell a new lease on the land at a speculative price made possible by large expenditures of a lessee in drilling nearby tests. *Neither should it be used to penalize a lessee for the exercise of caution in the conduct of an expensive and hazardous enterprise, which if successful will aid both lessor and lessee. * * *"* (Emphasis supplied.) According to plaintiffs' own testimony an additional well on the instant lease would cost about $100,000. Thus far there is no showing of lack of diligence by defendant in not investing such money.

19. Witness Steinle testified that he had carefully studied all available data concerning the Blake lease and that from such information there exists no reasonable expectation that further development would be profitable. Witness Roberts stated that under the presently known facts and circumstances (see fn. 17 in particular, dealing with probable water level) he could not recommend the drilling of an additional well upon the Blake lease, although possibly future facts gained in the field would justify the development of lower sands.

in judging the prudence of the operator, the drilling and other activities of the defendant in the immediate vicinity of the Blake lease point up that the defendant has made a diligent effort to obtain additional information which would justify more drilling on the instant lease.[20]

The defendant is entitled to judgment. Counsel should submit a journal entry which conforms with this opinion within 15 days.

20. Since the Ruel Blake No. 1 well was completed in January of 1946, the defendant company has drilled six other wells in the immediate vicinity on leases directly to the east, north and west. These seven wells are in the red a total of $582,625 (see finding no. 8). Although the gained information has not warranted further development at this time, defendant's evidenced their continued interest in this immediate area by taking a new lease in 1947 on the Don Williams tract immediately east of the Blake lease on which a dry hole was completed in 1946.