James D. KNIGHT, E. T. Knight and Lucille L. Knight, Plaintiffs in Error,

v.

HERNDON DRILLING COMPANY, a Corporation, John J. Hassler, T. L. Bates, and North American Petroleum Company, a Co-partnership, Defendants in Error.

No. 36679.

Supreme Court of Oklahoma.

July 5, 1955.

Rehearing Denied Jan. 31, 1956.

Application for Leave to File Second Petition for Rehearing Denied May 1, 1956.

Ram Morrison, Oklahoma City, Leon J. York and John C. Monk, Stillwater, for plaintiffs in error.

John E. Curran, Tulsa, and Hoel & Horton, Stillwater, for defendants in error, Herndon Drilling Co. and T. L. Bates.

BLACKBIRD, Justice.

This appeal concerns an action to cancel a five-year oil and gas lease as to 80 of the 100 acres it covered, described as the West Half of the Northwest Quarter of Section 6, Township 18 North, Range 2 East, in Payne County, Oklahoma. It was brought by plaintiffs in error, who are the owners of the land, and who, as lessors, executed and delivered the lease to one, Payne, in

the spring of 1951. A few months later, or on October 12th of the same year, Payne assigned the lease to defendant in error, Herndon Drilling Company. Although the defendants in error, John J. Hassler and T. L. Bates, are apparently owners of interests in the oil produced from said lease, they have no relationship to the material issues in this appeal, and will not be further mentioned herein. Accordingly, the controversy will be discussed as if the plaintiffs in error and the above-named drilling company were the only parties involved, and we will refer to them by their trial court designations of "plaintiffs" and "defendant".

The lease in question, which, together with the land covered thereby, will sometimes be referred to as the "Knight Lease", was one of many that defendant completed procuring during 1951. The acreage covered by these leases as a whole aggregated some 2,000 or 2,200 acres, referred to as a "block", in the same vicinity as plaintiffs' land. The initial well drilled on the block, all of which was in so-called "wildcat" or unexplored territory, was called the "Mullendore No. 1". It was completed as a dry hole in November, 1951, and was situated in the center of a 10-acre tract. A tract of this size was originally considered the minimum acreage sufficient for, and is generally referred to in this case, as a (potential) "location." The Mullendore No. 1's "location" adjoins the NW 10 acres of the Knight Lease, and is what is known in the oil industry as a "direct offset" to that lease.

After failing to discover production in the Mullendore No. 1, defendant assigned to Mohawk Drilling Company much of its block of leases in the area, including one covering land extending all along the west line of the Knight Lease, which we will call the "Brown Lease", and another covering land extending along the Knight Lease's southern boundary, which we will call the "Mary Johnson Lease." On the latter lease, Mohawk Drilling Company, in July, 1952, drilled a well designated the "Mary Johnson No. 1", directly offsetting the Knight Lease on the south. It was drilled to a depth of 5,019 feet into the

second Wilcox sand, where only a small showing of oil was encountered, together with some salt water in this and some of the shallower formations. After setting pipe and plugging the hole back to the Viola Limestone formation, which had been encountered at a depth of approximately 4,900 feet, and perforating the pipe about the middle of the porous part of said formation, and acidizing and re-acidizing it, and shutting off the water by what was termed a "squeezing off" process, the well was finally completed the latter part of July, 1952, as a producer from the Viola Limestone. Through a quarter inch choke, the well initially flowed 144 barrels of oil a day, with no water. According to the records of the company purchasing its production, the well produced more than 1,000 barrels of high gravity oil during the month of July; and for this month, and the months of August, September and October, it flowed an average of 66.8 barrels per day.

The next well drilled in this area was the "Mary Johnson No. 2", a diagonal offset to the southeast from the Mary Johnson No. 1. It was completed in September, 1952, as a dry hole.

Thereafter, on October 15, 1952, plaintiffs wrote defendant adverting to the fact that the Mary Johnson No. 1 well, offsetting their leased land on the south, had been producing oil for approximately three months, alleging that said well was draining oil from under their land, demanding that, on their land, defendant drill a well offsetting said Mary Johnson No. 1, and threatening that, if such a drilling operation was not commenced within 30 days, they would take court action to cancel the Knight Lease. After 12 days, or on October 27th, defendant wrote plaintiffs a letter in reply, to the effect that it had been "closely" watching the "completion and production" from the Mary Johnson No. 1 well, and stating that said well was "definitely a marginal well", and that "we do not feel that a prudent operator would at this time commence the drilling of an offset well." The letter further stated:

"We will use our best efforts to get some more development done in this

area and this letter is to assure you we do not intend to hold your lease for an unreasonable length of time without drilling on it, or releasing it.

"We feel that the time set out in your letter for the commencement of a well is entirely too soon, but we will in the near future, after we have allowed as much time as we feel we should, either drill a well, or release your lease."

By letter dated November 3, 1952, plaintiffs wrote defendant as follows:

"We are not qualifying our Notice to you dated October 15, 1952.

"Under the oil and gas lease we cannot drill a well to protect our property from drainage. If you release the lease, we can protect our property by getting others to drill, without delay, a well on our property. The drilling of other wells on other land will not protect us or stop the drainage and damage to our land nor will it satisfy your obligation to us, under the lease, to protect our property from further damage.

"If you do not commence a well or release the oil and gas lease on our land by November 15, 1952, so we can get someone to protect our property, we will be constrained to file an action for the cancellation of the lease and for damages for the damages caused by your failure to comply with the implied covenant to protect the property from drainage."

About the time of the above-described correspondence between the plaintiffs and defendant, a company named North American Petroleum Company negotiated what was termed a "farmout" arrangement with Mohawk Drilling Company, under the terms of which North American commenced a well designated as "Snow-Berry No. 1", on a tract of land which joined the Brown Lease on the south and whose northeast corner touched the Knight Lease's southwest corner. The Snow-Berry No. 1 was located due west, and was a direct offset, of the Mary Johnson No. 1. From the record, it does not unequivocally appear exactly when the Snow-Berry No. 1 was completed. Mr. Bill Roberts, who was general manager of North American at that time, testified that the actual drilling of the well was completed either the last of December, 1952, or the first of January, 1953, but, on cross examination, he confirmed a record showing the well's completion date in February, 1953, and went on to explain "why it took us 60 days to complete that well." From this explanation, it appears that in some of his testimony Mr. Roberts used the verb "complete" as referring to perforating, acidizing, "squeezing-off" and other work necessary to making the well an oil producer after the bottom of the hole had been reached by drilling. At any rate this well was finally completed as a producer, and the oil purchaser's records show it produced 2,679.70 barrels of oil, with a gross value (before tax payments) of $7,515.23 during the first eleven months of 1953.

After it appeared reasonably certain that the above-described well southwest of plaintiffs' land would, like the Mary Johnson No. 1, be a producer, plaintiffs again wrote defendant under date of January 26, 195(3) asserting that the latter was violating the implied terms of the lease involved herein (by delaying commencement of a well thereunder), and that if they didn't "receive satisfactory assurances of an immediate drilling operations to protect our land from drainage, we will within six days from the date hereof, commence an action for cancellation of the lease and damages suffered by us because of your failure to protect our land from drainage." Having received no answer to this letter on or before February 4, 1953, plaintiffs on that date filed the present action. About the same date, or the next day, February 5, 1953, the defendant, through its president, Seth Herndon, negotiated an arrangement with North American Petroleum Company, through its president, Mr. Roberts, whereby defendant assigned the Knight Lease to North American, in consideration for the latter's drilling of a well on said leasehold of sufficient depth to test the Viola Limestone, said well to be commenced within 30 days. A further con-

sideration for said assignment was a ⅟₁₆th overriding royalty to be owned by defendant.

The summons in the present action was served upon defendant by delivering a copy thereof to Mr. Herndon on February 5th. (Mr. Herndon testified that when he was so served, the letter to North American Petroleum Company, inclosing the Knight Lease assignment and confirming the above-described farmout arrangement he had made with said company's president, Mr. Roberts, via telephone earlier the same day, had already been mailed. He further stated that when he mailed the letter he didn't know the suit had been filed. Other evidence, including a letter from him to North American Petroleum Company, dated February 16, 1953, shows that when he· had the above-mentioned telephone conversation with Mr. Roberts, he anticipated "there might be such a development").

On February 6, 1953, defendant's Tulsa attorney wrote plaintiffs' Oklahoma City attorney, stating that Mr. Herndon had just handed him the copy of the summons, by which defendant had been served in this action, and informing him that defendant had made arrangements to get the Knight Lease drilled. In this letter, defendant's attorney further stated that "we * * * naturally are at somewhat of a disadvantage in closing our deal with the filing of this case," and he inquired "if the commencement of drilling within the next 60 days would satisfy * * *" plaintiffs, and "enable the dismissal of the case." By letter dated the next day, plaintiffs' attorney replied, in effect, that defendant's effort toward the commencing of drilling operations on the lease had come too late, that his clients considered the lease already forfeited or abandoned; and he indicated that the suit would not be dismissed.

In the meantime, Mr. Roberts of North American had contacted plaintiffs' Oklahoma City attorney on February 5th, and asked him if plaintiffs would dismiss the action if his company commenced a well on their land within 30 days. When said attorney indicated to him that plaintiffs would not, and also advised him that they would permit neither defendant nor any assignee of said company's lease "on the premises", Mr. Roberts entered into negotiations with said attorney for a new one-year lease, dated the same date, from plaintiffs direct to North American. This lease was later delivered to North American (though never recorded). Under it, plaintiffs, rather than defendant (as in the farmout contract between defendant and North American), are to have a ⅟₁₆th overriding royalty, in addition to their regular lessor's ⅛th royalty.

Thereafter, on April 29, 1953, North American completed on the tract involved here, a producing well referred to as the Knight No. 1"; and the oil purchaser's record on said well shows that during the first four months of its operation, it produced an average of more than 2,150 barrels of oil per month, thereafter dropping to 1,139.44 barrels for the month of December, 1953, with a total of 15,825.97 gross barrels, of a gross value of $44,989.-86 for its eight producing months of that year; and⁴ for the first three months of 1954 (previous to the trial of this case) it had produced more than 800 barrels each month, with a total gross value for said period of $7,197.54.

During the latter part of the year 1953, three wells were completed on the Brown Lease adjoining plaintiffs' land on the west. The first of these, the "Brown No. 1", was a direct western offset to the Knight No. 1; the second, the "Brown No. 2", was a direct northern offset to the Brown No. 1, and the third, known as the "Brown No. 3", which was drilled near the western boundary of the Brown Lease and across a square 20-acre tract, or two "locations" from the Knight Lease, was a dry hole. The two Brown wells nearest the Knight Lease here involved have produced between July, 1953, and April, 1954, an average of more than 3,400 barrels per month, with a gross value, before taxes of more than $83,000.

As a defense to plaintiffs' action, defendant denied that they had failed to perform all of its obligations under the lease and pleaded that plaintiffs' alleged cause of

action had been rendered "moot" by the drilling of the Knight No. 1 well which was then producing "90 barrels of oil daily."

North American Petroleum Company filed a pleading termed an "Interplea" in which it asserted the facts hereinbefore related, showing that it owned the "working interest" in said lease, less a ⅟₁₆th overriding interest, both by virtue of assignment of defendant's lease and by virtue of the unrecorded lease direct from plaintiffs. It prayed the court to determine which of the two leases was then subsisting and in force, and whether the ⅟₁₆th overriding royalty was to be paid to defendant or to plaintiffs.

At the trial before the court, plaintiffs introduced evidence contemplated to show that the approximate 6 months' period which had elapsed between October 12, 1951, the date the Knight Lease was assigned to defendant, and the date in April, 1953, that the Knight No. 1 was commenced under the farmout contract defendant entered into with North American, was, under the circumstances, an unreasonable period of time for defendant to wait before commencing a well on said lease; and that a reasonable and prudent operator would have commenced, or caused to be commenced, such drilling operations much sooner than defendant had, and long prior to the time plaintiffs began their present effort to have said lease cancelled. One of those who testified for plaintiffs as a competent witness, because of experience in such matters, stated that he would have commenced drilling operations on the Knight Lease immediately after production tests upon completion of the Mary Johnson No. 1, in July, 1952, proved it to be a good producer. Others testified that a reasonable time for a prudent operator to have waited to commence drilling operations on said lease, after such proof of production along its southern boundary, was 90 days, and one or more others set the maximum for such delay as 120 days. Only Seth Herndon, defendant's president, and his son, Jack, vice-president and geologist of said company testified to the contrary.

In connection with plaintiffs' assertion that the Mary Johnson No. 1 well had been draining oil from under their land ever since its completion, it appears without contradiction that several months previous to the filing of this action, the Corporation Commission had ordered 20-acre well spacing for said area.

At the close of the trial, the court ruled that plaintiffs had not discharged their burden of proving entitlement to cancellation of the lease, and thereupon rendered judgment for the defendant.

█ After plaintiffs had lodged this appeal from said judgment, defendant filed a motion to dismiss it on the ground that North American Petroleum Company is a necessary party hereto, but has not been served with the casemade, nor has ever entered any appearance herein. Said motion to dismiss was heretofore tentatively overruled to be disposed of upon consideration of the appeal on its merits. Since said ruling, we have thoroughly considered the arguments advanced for and against said motion, and have determined that on the basis of the North American Petroleum Company's "Interplea" and the undisputed facts concerning its "neutral" position in this controversy, it is not an "adverse" or "opposite" party within the meaning of our applicable statute. See 12 O.S.1951 § 958, and Martin v. Fretwell, 202 Okl. 204, 211 P.2d 529, and other cases digested in 12 O.S.A. § 958.

█ With reference to the merits of the controversy, plaintiffs contend that the trial court's judgment is both contrary to law and to the evidence, while defendant maintains that the trial court's judgment should be affirmed as not clearly against the weight of the evidence. In support of its position, defendant cites Gibson & Jennings, Inc., v. Amos Drilling Co., 196 Okl. 143, 162 P.2d 1002, 1003, for the proposition that after "service of notice for additional development by the lessor the obligation of lessee is suspended until the settlement of the controversy." Defendant fails to demonstrate wherein that case is applicable here. It further cites quotations and excerpts from this court's opinion in Texas Consolidated Oils v. Vann, 208 Okl. 673, 258 P.2d 679, 687, and other cases, to the effect that under the prudent

operator rule there is no obligation on a lessee to drill a well offsetting one on an adjoining lease except:

"'* * * where the drilling of such well would probably, taking all of the existing facts and circumstances into consideration, produce sufficient oil to repay the cost of drilling, equipping, and operating such well, and also to produce a reasonable profit on the entire outlay, and neither the lessee nor the lessor is the arbiter of whether an offset well should be drilled * * * but both are bound by what a reasonably prudent operator would do under similar circumstances, and under no circumstances will a lessee be required to drill an offset * * * when the same would probably not result profitably to him.'"

Defendant also calls our attention to Shell Oil Co. v. Howell, 208 Okl. 598, 258 P.2d 661, and Shell Oil Co. v. Lee, Okl., 258 P.2d 666, 669, wherein this court recognized that feasible arrangements for exploration in a " 'wildcat' area, often require much time;" and that a lessee may have invested in a lease "much more money * * * than it apparently has any hope or chance of getting out * * *". In this connection, our attention is directed to testimony variously estimating the cost of drilling a well to the Viola Limestone in that area at from $50,000 to $60,000, with an additional $6,000 or $6,500 necessary to put it on the pump after it has ceased to flow; and to defendant's testimony that the dry hole, known as the Mullendore No. 1, cost $65,-000. With reference to the latter figure, other testimony indicates that since the drilling of said Mullendore No. 1, operators in the area have learned to complete Viola Limestone wells without quite so much expense and trouble as was experienced with that well. By accepting defendant's maximum figures as undisputed, the evidence as a whole indicates that never since the completion and testing of the Mary Johnson No. 1 well, has the information in that area shown that the drilling of an offset test on plaintiffs' lease " 'would probably not'" be a profitable operation under the rule in the Texas Consolidated

Oils case, supra. Of all of the oil industry witnesses who testified, only Messrs. Seth and Jack Herndon's testimony was to the effect that a reasonable and prudent operator would not have drilled such offset well long before defendant finally farmed out the Knight Lease and let North American drill it. Other evidence was to the effect that at least one other operator contacted defendant company seeking a farmout contract to drill such a well many days before defendant finally, and under the pressure of plaintiffs' insistence on cancellation of the lease, gave North American such a contract. Also, the two Herndons were the only ones who expressed the opinion that such "producers" as the Mary Johnson No. 1 and the Knight No. 1 would never "pay out." While it appears from the evidence that the monthly production of all of the producing wells in the area fluctuates and tends to decline as their oil's lifting agency, the gas pressure, declines, and that all of the wells eventually have to be "put on the pump", there is no proof that even after pumping becomes necessary, the operation of said well is not a profitable venture or that their production is not in sufficient quantities to more than eventually liquidate their cost. Defendant's testimony was to the effect that it costs 50¢ per barrel to operate such a well, after being placed on the pump, but, at the present market price of high gravity oil (such as these wells were indicated to produce) it would seem that after paying such operating costs, there should be a substantial amount left to apply on the cost of drilling, completing and putting such a well on the pump. Of course the complete liquidation of such costs may take a period of years, but this does not mean that such a well will not be considered a profitable venture under the prudent operator rule; nor that an operator may wait any such period before discharging his obligation under a lease to protect the land covered thereby from drainage. This Court has held that it is not necessary under said rule for such operator to be assured that a well will repay its cost, Henry v. Clay, Okl., 274 P.2d 545; and that rule was never intended to take the

element of risk entirely out of oil lease development. A reasonable and prudent operator knows (and it is a matter of more or less common knowledge) that there is such an element, to a greater or lesser extent, in almost any well he might drill, whether in a so-called "proven" area, or in a "wildcat" area.

As far as the record shows the Herndons seem to have been of the belief ever since learning from drilling the Mullendore No. 1, how high the cost of wells to the Viola Limestone in that area could be, that such wells would not "pay out", yet, in their testimony, they apparently tried to explain their long delay in making arrangements for the drilling of a well on plaintiffs' land by saying that their company was waiting to see how the production from the Mary Johnson No. 1 and Snow-Berry No. 1 would "hold up." They emphasized the admitted fact that there had been no other Viola Limestone production in that part of Oklahoma, but the testimony indicates that if they had resorted to information concerning such production in the Beebee and St. Louis fields of Pontotoc and Pottawatomie Counties, they would have learned that though the daily potential of such wells has a tendency to decrease sharply after they stop flowing, they have a record of long lived production in paying quantities after being placed on the pump. In view of this and the testimony indicating that if defendant believed drilling on plaintiffs' lease would never pay for itself, it might, before this action was ever brought, have procured such drilling at the expense of another operator by a farmout arrangement like it *finally* made after the action was filed, defendant's position is not well taken, nor impressive from an equitable standpoint. Defendant points to the principle that neither the lessor nor the lessee is the arbiter of the rights of the other and it says it had a right to make its own decision as to whether it would farm out the lease or do the drilling itself. This is true, but defendant could not hold the lease indefinitely while attempting to make such decision, especially when, during every day that elapsed the property was being depleted by drainage. In this connection see the quotation from Hay v. Shell Petroleum Corp., D.C.W.D.Okl., 30 F.Supp. 663, in Shell Oil Co. v. Howell, supra.

After a thorough examination of the record, we are of the opinion that the judgment of the trial court is clearly against the weight of the evidence, and that same should be reversed. It is hereby so ordered, with directions to the trial court to vacate said judgment and render judgment for plaintiffs, cancelling the lease under which defendant claims.

JOHNSON, C. J., and CORN, DAVISON and JACKSON, JJ., concur.

WILLIAMS, V. C. J., and WELCH and HALLEY, JJ., dissent.